McLANE, APPELLEE, *v.* STILLMAKER, APPELLANT.
McLANE, APPELLANT, *v.* STILLMAKER, APPELLEE.

(Nos. 8247 and 8248—Decided April 29, 1957.)

Mr. C. R. Beirne and Mr. Carl W. Vollman, for appellee in cause No. 8247 and appellant in cause No. 8248.

Mr. Robert G. McIntosh, for appellant in cause No. 8247 and appellee in cause No. 8248.

MATTHEWS, J. These two appeals are from different orders in the same case and have been consolidated for presentation to this court.

The issues of fact were raised by a second amended petition, the answer thereto, and the reply to the answer.

In the second amended petition, the plaintiff alleges that while he was a social guest of the defendant at defendant's home on July 24, 1954, the defendant discharged a Daisy B-B gun at a fly on a brick wall about two feet from the muzzle of the gun, and that the pellet hit the wall, rebounded and struck the plaintiff in the right eye, so injuring it as to make it necessary to remove the eyeball.

As a basis of liability, the plaintiff alleges that his injury was caused by the wanton and wilful misconduct of the defendant in standing so close to the wall and discharging the gun at a time when he knew that the plaintiff was standing nearby and facing the wall, and when the defendant knew, by reason of his long experience with guns, of the natural tendency of bullets and pellets to rebound from a flat brick surface and of the danger to others nearby from such activity. The plaintiff also stigmatizes the defendant's conduct as negligent, and alleges that his injury was the direct result of such negligence.

By way of answer, the defendant admits that the plaintiff was his guest at his home on July 24, 1954, that plaintiff and defendant engaged in target practice by shooting at flies with a Daisy B-B gun, and that plaintiff was injured. His answer also contains a general denial of all other allegations and af-

firmatively alleges that plaintiff was a participant in the conduct which brought about his injury, was aware of the danger incident thereto, and assumed the risk of such danger.

The answer also contains allegations to the effect that the plaintiff was negligent, and that such negligence directly contributed to his injury.

A reply traverses the averments of this answer.

At the conclusion of the plaintiff's evidence, the defendant moved for an instructed verdict in his favor, which motion the court overruled. The motion was renewed at the conclusion of all the evidence, and was again overruled.

The court then announced that the issue which would be submitted to the jury was whether the evidence showed that defendant's conduct was wanton and liability made to depend upon its finding on that issue. Thereupon defendant's counsel moved for an instruction to the jury that, as reasonable minds could not differ on the question of proximate cause, this issue should be withdrawn, and only the issue of whether defendant's conduct had been wanton, and the damages, submitted. The court overruled that motion.

Before argument to the jury, defendant's counsel submitted many special instructions to be given to the jury, some relating to negligence and some relating to wanton misconduct and assumption of risk. It appears that the trial judge had prepared his general charge and that he read it to counsel in the absence of the jury. Thereupon plaintiff's counsel withdrew his request as to most of his special instructions. Plaintiff's counsel predicate their contention, that the defendant is precluded from claiming that the plaintiff assumed the risk, on his withdrawal of these special instructions relating to assumption of risk. As will appear later, it is our conclusion that the defendant did not waive his right to challenge the existence of a cause of action, and if the alleged waiver should be given any effect, that is what it would amount to.

The court then proceeded to give the jury a clear and correct instruction in accordance with its announced view that the defendant's liability depended upon a finding that he had been guilty of wanton misconduct that directly caused the plaintiff's

injury. Upon this issue the jury found for the plaintiff and assessed his damages at $50,000.

The defendant filed a motion for judgment notwithstanding the verdict and also a motion for a new trial.

The court overruled the motion for judgment notwithstanding the verdict but sustained the motion for a new trial on the ground, as recited in the journal entry, that the "verdict of the jury was manifestly against the weight of the evidence both in amount and for plaintiff."

We will consider, first, the plaintiff's appeal from the order granting a new trial.

We need not say much on this subject. It is conceded that we would be justified in reversing that order only if we found the trial court abused its discretion. That we cannot find, as will fully appear in our consideration of the defendant's appeal from the order overruling his motions for an instructed verdict and for judgment.

The defendant's appeal raises the question whether there is any substantial evidence of wanton misconduct on his part and, if not, should the judgment be reversed and final judgment rendered in this court, or should the action be remanded for further proceedings.

There is no substantial dispute in the evidence. The defendant is the uncle of the plaintiff and his brother James. They were manifestly congenial and all liked to fish and hunt and had indulged in these pastimes together on many occasions. The plaintiff was 26 years old at the time of the trial. The plaintiff or his brother telephoned the defendant on July 24, 1954, to find out whether he was at home and if so whether it would be satisfactory with him for them to visit him. Finding that they would be welcome, they proceeded to defendant's home, arriving there at about 1:00 p. m. They were welcomed by defendant and were invited into a room in his residence where there were fishing tackle and four guns, including a Daisy B-B gun. They talked about going to Rocky Fork to fish but finally concluded that, because of the distance and the lateness of the hour, there was not enough daytime left, and so they abandoned the plan. They then drifted into a discussion of the guns and of hunting, and in about a half hour they were in defendant's

back yard, a short distance from the house, with the Daisy B-B gun, engaged in shooting at flies enticed there by some sort of device intended to destroy them. The men were taking turns shooting at the flies. A fly was discovered on the brick wall of the house, and the defendant, taking his turn with the B-B gun, fired the shot that hit the fly on the wall and then rebounded and hit the plaintiff in the eye, causing the injuries complained of. We quote from the testimony, on direct examination, of the plaintiff as to his conduct and the conduct of the defendant just before and at the time the plaintiff was injured:

"Well, Jim and I arrived, and when we did pull up my Uncle Bern came to the car. And we left the car and we had went into his one room there, which he calls his recreation room, and we did talk about going fishing. And, as was said, it was late and we thought that by the time we got up there it would be dark and we would have no time to fish. So somehow the subject of guns got up. Who made that I don't know, but we were outside at the time, and my Uncle Bern got the gun and we stood out in front of the garage doors.

"* * *

"As I recall, there was only two shots shot on the sidewalk. The first shot was shot by my Uncle Bern. The next shot was shot by me. And those two shots, as I recall, the first one was directed to the plant, and the shot that I shot at was at the sidewalk away from me around six feet, and I shot down. And it was then that we couldn't find flies on the sidewalk, and somehow or another—I'm not real sure who said the fly was on the drain spout, but I recall that my Uncle Bern said that if we shot there it would possibly dent and chip the paint off. And somehow or another it got around that this fly was on the brick, and at the time of the shot I was more or less on the right of my Uncle Bern, and as he aimed I had to jump over—well, when I say jump, I couldn't rest real well on my one leg because it was in a cast, and I stood off in back of him but to his right, sir, and I looked directly down the gun.

"* * *

"* * * and then I moved here after I saw he was going to aim, and I thought it best I get there. And I was standing off to his right and sighting down the gun.

"'* * *

"I was, well, almost touching my Uncle Bern when I was looking down the gun barrel."

On cross-examination, the testimony was as follows:

"Q. At the time you saw your Uncle Bern aiming at this fly on the wall and you aimed with him you were conscious of the position of that fly on the wall, were you not? A. You mean if I saw the fly there?

"Q. Yes. A. Yes, sir, because it was pointed out to me.

"Q. And you were well aware of what he was aiming at? A. Yes, sir.

"Q. And in aiming with him you had your head or your eye that was aiming about over his right shoulder? A. Well, yes, as it was explained there on the board, sir.

"'* * *

"Q. You expected a B-B to come out of it when he shot, didn't you? A. Yes, sir."

There is much more detail in the record, but we believe the foregoing quotations from the plaintiff's testimony sufficiently portray the circumstances. Of course, the plaintiff is bound by his own testimony, even where a statement is contradicted but not withdrawn elsewhere in his testimony. *Winkler* v. *City of Columbus*, 149 Ohio St., 39, 77 N. E. (2d), 461. However, there is no contradiction in his testimony or in the testimony of any other witness.

This evidence creates a mental picture of two adult men, of wide experience and informed of all the facts, engaged most intimately in accomplishing an end desired by both, that is, the hitting of the fly. The only respect in which the plaintiff's participation differed from the defendant's was that the latter held the gun. They were united in the intent to sight the gun so that the pellet would hit the fly, and that intent was executed and the fly was killed. Being adults, they must be held to have known the natural consequences of their actions. They—plaintiff and defendant—must be presumed to have known that a B-B pellet would not penetrate a brick wall, and that it would be deflected and would ricochet in some direction, and, perhaps, in many directions, from surrounding objects. Manifestly, they were mistaken as to the angle of the deflection, but the plaintiff

was in just as good a position as the defendant to determine that matter and to remove himself from the zone of danger.

It seems to us that this is a classic case for the application of the principle of assumption of risk or, as it formerly was and is sometimes now described by the Latin phrase, *volenti non fit injuria*. It is a doctrine closely akin to contributory negligence and, like contributory negligence, need not be pleaded. It is sufficient if the evidence calls for the application of the principle. *Fay* v. *Thrasher*, 77 Ohio App., 179, 184, 66 N. E. (2d), 236.

The subject of assumption of risk is fully covered in 38 American Jurisprudence, 845, 846, Section 171, from which we quote:

"The principle that one who voluntarily assumed the risk of injury from a known danger is debarred from a recovery is recognized in negligence cases. As stated, a plaintiff who, by his conduct, has brought himself within the operation of the maxim, *'volenti non fit injuria,'* cannot recover on the basis of the defendant's negligence. In the words of the maxim as translated, 'that to which a person assents is not esteemed in law an injury.' Although there is authority for confining the doctrine of assumption of risk to cases arising out of the relation of master and servant, or at least to cases involving a contract relationship, it is now fairly well settled that the defense of assumed risk may exist independently of the relation of master and servant. The maxim, *'volenti non fit injuria,'* applies in a proper case independently of any contract relation. It is said that one who knows, appreciates, and deliberately exposes himself to a danger 'assumes the risk' thereof. One cannot deliberately incur an obvious risk of personal injury, especially when preventive measures are at hand, and then hold the author of the danger for the ensuing injury."

And, at page 847, Section 172, *ibid.*, the distinction between the two doctrines is pointed out in these words:

"There is a line of demarcation which, if carefully scrutinized and followed, will allow the court to differentiate between them. Assumption of risk rests in contract or in the principle expressed by the ancient maxim, *'volenti non fit injuria,'* whereas contributory negligence rests in tort. The for-

mer involves a choice made more or less deliberately and negatives liability without reference to the fact that the plaintiff may have acted with due care, whereas, the defense of contributory negligence implies the failure of the plaintiff to exercise due care. As stated in some decisions, assumption of risk is a mental state of willingness, whereas, contributory negligence is a matter of conduct.''

Reference has been made to the case of *Kuhn* v. *Bader,* 89 Ohio App., 203, 101 N. E. (2d), 322, which involved an injury as the result of the discharge of a firearm at a target, but the plaintiff in that case was not a participant with the defendant, and the case, therefore, did not involve either assumption of risk or contributory negligence.

So, we conclude that the court erred in overruling the defendant's motion for judgment notwithstanding the verdict and, as a necessary corollary, did not err to the prejudice of the plaintiff in setting aside the verdict and granting a new trial.

It is urged, however, that the court cannot in any event do more than reverse the judgment and remand the cause for further proceedings. It is said that submitting this cause on the issue of wanton misconduct deprived the plaintiff of the opportunity to strengthen his evidence exculpating him from the charge of contributory negligence. We do not think this occurred. The plaintiff alleges both wanton misconduct and negligence in his second amended petition. He, therefore, knew that he would be obliged to answer to the charge of contributory negligence and must have prepared himself accordingly and introduced whatever evidence he had on that subject, for it was not until after all the evidence had been introduced and both parties had rested that the court announced that its purpose was to submit the case on the theory of wanton misconduct alone.

We are of the opinion that the plaintiff was not prejudiced in any way by the course of the trial, or limited in any way in the introduction of evidence, no matter what theory should be finally adopted. It so happens that there is no conflict in the evidence, and whether it is characterized as relating to assumption of risk or contributory negligence does not change its es-

sential character. It simply shows that the plaintiff has no cause of action against the defendant for the injury received.

For these reasons, the judgment is reversed, and final judgment rendered for the defendant.

*Judgment reversed.*

HILDEBRANT, P. J., and LONG, J., concur.