369 P.2d 290

**Hattie DE VAS, Plaintiff and Respondent,**

**v.**

**Brack Howard NOBLE and Ann C. Noble, Defendants and Appellants.**

**No. 9478.**

Supreme Court of Utah.

Feb. 27, 1962.

Cotro-Manes & Cotro-Manes, Salt Lake City, for appellants.

Bean & Bean, Layton, for respondent.

CROCKETT, Justice.

Defendants Mr. and Mrs. Brack H. Noble appeal from a judgment nullifying two deeds to real property obtained from the plaintiff: one on the ground of fraud; and the other for forgery; and also from an award of damages.

█ The trial court having found for the plaintiff, it is both our prerogative and duty to review the evidence and every inference that may be fairly and reasonably drawn therefrom in the light most favorable to the plaintiff, which we do in our treatment of the facts.[1]

Plaintiff Hattie DeVas is an elderly lady of the type sometimes referred to as a "character": She has lived for many years as a recluse in a makeshift dwelling on the property in question in the brush-covered hills east of Farmington, Utah. Her unique home and manner of living, which we will again refer to below, are quite detached from civilization and its ways, and unspoiled by such modern trappings as running water or electricity or the contrivances attendant therewith. The suspicions of limitation upon her cerebral equipment were such that before she was permitted to testify the trial judge, with the agreement of counsel, directed that she be given a psychiatric examination. The report indicated that she could testify but the examiner had reservations as to the confidence to be reposed in her testimony and that it should be received with caution.

Essential facts surrounding the procurement of the deeds referred to are these: Hattie DeVas owned about 30 acres of land up in the foothills. It had been of little value until the urban incursion during and following World War II, which burgeoned the population of Davis County. In September of 1952, defendant Brack H. Noble talked to her about the possibility of purchasing some of her land and also discussed some other matters, including the desirability of a survey; and that running water should be brought to the plaintiff's place. Mr. Noble in fact got Mr. Robert G. Harding to survey part of the plaintiff's land. On September 23, 1952, the plaintiff signed a warranty deed to Mr. Noble of about 30 acres of the land. The document was signed in the office of attorney Wendel B. Hammond at Bountiful, who acknowledged the plaintiff's signature as notary. The plaintiff's version of this transaction is that she signed a paper so there could be a survey of the land. And while she admits that there had been an oral agreement to sell some of her land to Mr. Noble she claims no conveyance was

1. Fleming v. Fleming Felt Co., 7 Utah 2d 293, 323 P.2d 712.

to take place until she was informed of the number of acres the survey revealed she owned and a price per acre had been agreed upon between herself and Mr. Noble. She further maintains that she was never given the results of the survey; that no amount was ever agreed upon or paid for the property; and that she was induced by deception into signing the document, believing that the paper she signed was only to cause a survey to be made of her lands. A second deed, found to be a forgery, purported to convey to the Nobles about seven acres of her land.

■ The position of the plaintiff is that the defendants practiced a continuing fraud and deception upon her up to the spring of 1958, periodically promising to do right by her concerning her land but failing to do so. Defendants dispute these charges. They admit that no major monetary consideration was given for the land, but they assert that the following things constituted consideration for it: that the $10.00 nominal consideration recited in the first deed was in fact paid; that the Nobles were to cause the land to be surveyed; that they were to file on and develop a spring and pipe water to the plaintiff's property; and that they were to give the plaintiff a number of curios and antiques, all of which they claim was done. In view of the fact that upon disputed evidence the trial court

found that the defendants gave no consideration for the property, that finding is sustained.

■ The issue of gravest concern is defendants' contention that the statute of limitations had run before plaintiff commenced her action. Sec. 78–12–26(3) requires that an action for fraud be brought within three years. But it also expressly states that: " * * * the cause of action in such case shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake." The statute is an affirmative defense. Therefore, it must be expressly pleaded and proved.[2] Accordingly, once the fact of fraud in inducing the signing of the deed was established, as was here found by the trial court, it then became the responsibility of the defendants to show that Hattie DeVas was aware that she had been cheated out of her property more than three years before she instituted her action. The trial court refused to so believe and find, but found to the contrary: that the deception continued until shortly prior to the filing of the action.

Defendants insist that the evidence is such that it requires that finding to be overturned and found the other way as a matter of law. It must be conceded that statements were elicited from Mrs. DeVas which normally should be regarded as

---

2. Clawson v. Boston Acme Mines Dev. Co., 72 Utah 137, 147, 269 P. 147, 59 A.L.R. 1318.

showing that she knew she had been cheated out of her property shortly after the original conveyance. But there are unusual factors present here, which we discuss below, which must be taken into account in determining whether the trial court must be overruled in refusing to find in accordance with the defendants' contention.

██ In addressing the question whether the trial judge was obliged to make the finding demanded by the defendants, it is well to keep in mind certain principles applicable where it is required that a fact be found affirmatively and the court refuses to do so. In order to compel such a finding it is necessary that the evidence concerning the fact in question not only be of sufficient quality and substance to support a finding that it is true, but it must go beyond that and be such that all reasonable minds would so conclude. On the other hand, if there is any reasonable basis in the evidence, or lack of evidence, from which reasonable minds could honestly say they were not convinced of such facts by preponderance of the evidence, then the ruling of the trial court should be sustained.[3]

██ Due to his function as the determiner of the facts and his advantaged position in close proximity to the witnesses and the trial, it is his privilege to be the exclusive judge of the credibility of the witnesses, the weight to be given the evidence and the facts to be found therefrom. This includes appraisal of the ability of the witnesses to know and understand and their capacity to remember. The court's prerogative of course does not go so far as to permit him to stubbornly ignore and refuse to be guided by credible, uncontradicted evidence when all reasonable minds would accept it. That could result in arbitrary and unreasoning denial or distortion of justice. Nevertheless because of the prerogative just mentioned as judge of all aspects of the case, if the testimony of a witness is affected with any frailty which might reasonably be considered as casting suspicion upon it or discrediting its accuracy or truthfulness, the court is not bound to accept such testimony as the fact and so find. And the rule is not otherwise because the witness happened to be a party to the action.

Consistent with the observations just made, in appraising the testimony of plaintiff Hattie DeVas the trial judge was entitled to consider all of the facts and circumstances which shed light on its reliability: She was 78 years' of age; was hard of hearing; appeared to be very impulsive; was easily irritated; and was antagonistic toward opposing counsel. The judge manifested commendable eagerness to

3. See statement in Stickle v. Union Pacific R. R. Co., 122 Utah 477, 251 P.2d 837; also in Page v. Federal Security Ins., 8 Utah 2d 226, 332 P.2d 666.

get to the foundations of the facts and to the justice of this cause. In addition to the psychiatric examination of the plaintiff, and the examination during the trial, he visited her place and made some helpful observations about what he saw. From his description it seems an understatement to say merely that she is an eccentric personality. Her place may be described as a hodge-podge of a large variety of incongruities: animal, vegetable and mineral. The non-descript agglomeration of miscellany was appropriately complemented by a pungent assault on the olfactory sensibilities, emanating from guinea hens, turkeys, chickens, goats, sheep and dogs.

Mrs. DeVas seems to be quite in character with the surroundings. The trial judge referred to her as being in a "demented condition" and made some revealing comments as to his judgment of her mental capacity and the degree of confidence that could be placed in her testimony:

"Hattie has some degree of competency, but her line between that and the commitable personality is narrow.

\* \* \* \* \* \*

"She obviously denies signing documents, which could not possibly be an intentional lie, but obviously is a lie.

\* \* \* \* \* \*

"I find that her ability to recall events and explain it are now gone.

\* \* \* \* \* \*

"\* \* \* That it would be a fiction and an injustice to charge Hattie with knowing the things that a normal person would know.

\* \* \* \* \* \*

"I would strongly suggest to Mr. Bean [plaintiff's counsel] \* \* \* that he take steps to have some type of guardianship established over her to prevent this type of thing."

It is appropriate to note that the trial judge also forthrightly stated his conclusion as to the conduct of Mr. Noble in knowing and taking advantage of her deficiencies. He stated:

"that Mr. Noble has in fact relied upon her ineptness, knowing that she would not make such deductions as a reasonable person, and has. deliberately misled her and prevented her bring her action at an earlier time and should be estopped to claim the statute of limitations in this matter."

Having a significant bearing on the above point is the testimony of Mr. Gene Wheadon who testified that in a conversation with Nr. Noble, in response to questions as to how he had gotten Hattie's land, Mr. Noble said that he had "tricked" her out of it; and that Nr. Noble also stated that if nothing was done about it for seven years, "then it was outlawed".

The judge similarly gave his opinion as to the quality and reliability of the testimony of the defendant Noble:

" * * * Mr. Noble's account of things is obviously false."

Notwithstanding our recognition of the rule that ordinarily a person will be bound by his own testimony against his interests, that rule cannot be invoked under the circumstances here, where the trial court, supported by ample justification in the record, has concluded that the party has such mental limitations that her testimony is unreliable. It must be remembered that the rules of construction and interpretation of evidence are purposed to aid in ascertaining the truth and administering justice and that they should not be distorted by unreasoning rigidity into obstacles to the accomplishment of that objective.

Under the circumstances it would be a travesty upon justice to accede to the defendants' demand that the trial court be compelled to believe and make findings in accordance with erratic statements plaintiff may have made that would result in this court's lending its assistance to and compounding the trickery and deceit which the trial court found the defendants have indulged in to cheat the plaintiff out of her property without paying for it. This we will not deign to do. It is our conclusion that there is substantial basis in the record to justify the trial court's refusal to find that the plaintiff knew she had been cheated out of her property for more than three years prior to the commencement of her action.

In attacking the finding of forgery of the second deed as unsupported by competent evidence, the defendants make one point which we think worthy of comment: that the testimony of the handwriting expert, Mr. J. Percy Goddard, was not credible nor competent because it was grounded upon comparison of the signature on the deed with exemplars improperly admitted in evidence. They urge that where an examplar signature is given after the controversy has arisen, and for the sole purpose of such comparison, testimony based upon it is not admissible, citing Chemical Corn Exchange Bank & Trust v. Frankel et al.,[4] and the annotation thereto at 72 A.L.R.2d 1270 et seq. We acknowledge the merit of such a rule under some circumstances because of the possibility of simulation or deception. But the text relied upon by the defendants makes what we regard as a sound statement at page 1276:

" * * * Most of the courts which have considered the question have taken the position that the competency, as a standard of comparison to establish the genuineness of handwriting, of writings made after the controversy arose *depends upon the circumstances*

4. (Fla.App.) 111 So.2d 99, 72 A.L.R.2d 1270.

*under which such offered writings were made."* (Emphasis added.)

▮ The expert witness here, Mr. Goddard, appears to be a man of unquestioned integrity, competence and experience in this field. Plaintiff was requested to make a large number of exemplars of her signature (35 were made) just prior to the trial to be used as a standard of comparison with the signature on the questioned deed. There is usually safety in numbers and it is reasonable to assume that the expert requested this large number in order that the true characteristics of her writing could be seen and that any attempt at deception would be minimized. Any weakness that may have existed in the testimony on the basis of the objection made as to the exemplars went to its weight rather than to its admissibility. It was within the sound discretion of the trial court to judge the competency of the testimony proffered and we see no abuse thereof in receiving it.

▮ Yet to consider is the question of damages. The award of $200.00 damages is the amount Mr. Noble had received for the granting of an easement on the property to the Weber Basin Water District and is sound. As to the attack on the $750 awarded as punitive damages: In view of the belief and the findings of the trial court that the defendants had perpetrated an egregious fraud upon this hapless plaintiff, the elements requisite to the imposition of punitive damages are present. The amount awarded is not so disproportionate to the wrong done, nor to the amount of the plaintiff's recovery, that we could say that the court abused the latitude of discretion allowed it in setting such damages.[5]

Affirmed. Costs to plaintiff (respondent).

WADE, C. J., and McDONOUGH and CALLISTER, JJ., concur.

HENRIOD, Justice (dissenting).

I am constrained to dissent. The facts reported in the main opinion slant more favorably in the direction of the plaintiff's contention, as they should do in this case. Whether this justifies a conclusion that her theory of fraud is pointed up by clear and convincing evidence is another matter, one which may be debatable in any given set of circumstances. There may be opposition evidence that may be so unworthy of belief as almost to be discountable in toto. Aside from that however, it is my opinion that taking as undenied the facts recited in the main opinion itself, they do not seem to be so clear and convincing as to vitiate the solemnity of a sealed, recorded instrument, unattacked on any equitable basis for about seven years..

---

5. See 15 Am.Jur. Damages, Sec. 274; Evans v. Gaisford, 122 Utah 156, 247 P.2d 431.

It seems to me that the testimony of this lady of 76 years, given seven years after the subject deeds came into existence, in a self-serving atmosphere emphasized by a seven-year progressive psychiatric difficulty, highlighted by a pass at the defendant with one of Brigham Young's antique brooms, does not lend itself to any substantial degree of clarity or convincement, justifying avoidance of the documents. It seems that the trial court concluded as it did, not so much because of proven practiced fraud, but because of the differential in intelligence and business acumen of the parties, coupled with a considerable land value appreciation from time of deeds to trial. I believe I reasonably could have arrived at the result here, had plaintiff's theory been one of "no contract" by virtue of incompetency to contract and carry on ordinary business affairs by one of the parties. In such event it would be a case of invalidity since the inception, not one of a contract made, but voidable on some equitable grounds.

The trial court appears to have based his conclusion, at least in part, on the mental deficiency of plaintiff *at the time of the trial,* —not seven years before,—during which period certain degenerative processes may have produced a change that may not have been reflected seven years before.

In connection with this time lapse, and in harmony with the authorities cited by defendant as to the inadmissibility of handwriting exemplars furnished *after* trial began,[1] not before, where the trustworthiness of their genuineness would be eminently of more probative value, I believe their introduction erroneous to show forgery, not only because of their questionable probative value, but because a seven year period of time in the lives of persons in the same age group as plaintiff oftentimes shows a more rapid decadence in handwriting ability and similarity than it does mental degeneration.

I am unprepared to say that, assuming a 100% verity of the facts related in the main opinion, there is that quantum and quality of proof that may be said to prove clearly and convincingly that a seven-year-old, recorded instrument, acknowledged in a reputable attorney's office, should be avoidable on the grounds of fraud, particularly when such facts are adduced by a person of this lady's age whose mentality *at the time of the trial,* not before, was doubtful even in the contemplation of the trial court.

1. 72 A.L.R.2d 1277: "Thus, in most of such cases it has been held or recognized that a signature or specimen writing made after the controversy arose and for the purpose of being used as a standard of comparison with the disputed writing cannot be used as an exemplar on behalf of the person making it."