487 P.2d 1343

**Manuel D. DURAN, Petitioner,**

v.

**The NEW JERSEY ZINC COMPANY,
Respondent.**

No. 9286.

Supreme Court of New Mexico.

Aug. 9, 1971.

Robertson & Reynolds, Silver City, for petitioner.

R. E. Riordan, Neil E. Weinbrenner, Las Cruces, for respondent.

OPINION

STEPHENSON, Justice.

This is a workmen's compensation case in which the trial court entered judgment for the claimant which was, on appeal to the Court of Appeals, reversed and remanded with instructions to dismiss the complaint on the grounds that the claim was not timely filed. Section 59–10–13.6 (A), N.M.S.A., 1953 (Supp.1969) (Laws 1959, ch. 67, § 10; amended, Laws 1963, ch. 269, § 6 and Laws 1967, ch. 151, § 1) Duran v. The New Jersey Zinc Company, 82 N.M. 742, 487 P.2d 170 (Ct.App.1971). We granted certiorari, reverse the Court of Appeals and affirm the trial court's judgment.

The period of limitations does not commence to run until it becomes reasonably apparent, or should become reasonably apparent, to the workman that he has an injury for which he is entitled to compensation. Noland v. Young Drilling Company, 79 N.M. 444, 444 P.2d 771 (Ct.App. 1968).

The trial court found as a fact that:

"All physicians who treated the plaintiff for the accidental injury described herein released plaintiff to return to his full employment duties. It did not become and should not have become reasonably apparent to plaintiff that he had an injury on account of which he would have been entitled to Workmen's Compensation benefits."

■ The Court of Appeals in its opinion says that it was reasonably apparent to the claimant that he was partially disabled on and after January 4, 1964, the date that he returned to work after his first injury. In making this statement, the court has attributed to an uneducated laborer a knowledge of the human body which apparently transcends that possessed by the attending physician. It has succumbed to the vice of weighing the evidence.

The doctor who treated the claimant and performed two operations on him, on each occasion was of the view that he could thereafter perform the duties required by his regular employment. It was not until September of 1968 that claimant's physician felt that his workload should be lightened.

The claimant testified, inter alia:

"A. I didn't feel too good but the doctor and the company keep telling me it takes about two years or three years before I can feel normal in my arm so I just kept working, * * *"

There is substantial evidence to support the trial court's quoted finding.

" * * * [W]e are bound to view the evidence, together with all inferences reasonably deducible therefrom, in the light most favorable to support the findings. All evidence unfavorable to the findings must be disregarded and no unfavorable inferences will be drawn." Oberman v. Oberman, 82 N.M. 472, 483 P.2d 1312 (1971).

The rule is the same in workmen's compensation cases. Irvin v. Rainbo Baking Company, 76 N.M. 213, 413 P.2d 693 (1966); Gammon v. Ebasco Corporation, 74 N.M. 789, 399 P.2d 279 (1965); Montano v. Saavedra, 70 N.M. 332, 373 P.2d 824 (1962).

The Court of Appeals opinion places principal reliance upon Cordova v. Union Baking Company, 80 N.M. 241, 453 P.2d 761 (Ct.App.1969). A notable point of distinction between that case and this one is that in Cordova the Court of Appeals affirmed the trial court's determination that because it was reasonably apparent to the injured workman that he had a compensable injury, the period of limitations had therefore expired. Here, ignoring the substantial evidence rule, it has weighed the evidence and reversed.

Finally, the court, in speaking of the trial court's finding that we have quoted, says that there is a lack of evidence that claimant relied upon the doctor's statements. In accordance with our substantial evidence rule, such reliance, if it be consequential, is easily inferred in support of the trial court's finding and judgment. The inference arises from the fact that following, and in accordance with, the doctor's statements, the claimant did in fact twice return to his duties.

The decision of the Court of Appeals is reversed and the trial court is directed to reinstate and give full force and effect to its judgment.

It is so ordered.

COMPTON, C. J., and McMANUS, and MONTOYA, JJ., concur.

OMAN, Justice (dissenting).

As shown by the majority opinion and the opinion of the Court of Appeals, the decisive question is when it became reasonably apparent, or should have become reasonably apparent, to plaintiff that he was unable to some percentage-extent to perform the usual tasks in the work he was performing at the time of his injury and was unable to some percentage-extent to perform any work for which he is fitted by age, education, training, general physical and mental capacity and previous work experience.

He had been employed by defendant for a total of 22 years. His duties in this employment, as well as in his other employments, consisted of manual labor, much of which was heavy.

The essential finding by the trial court, as quoted in both the majority opinion and in the opinion of the Court of Appeals, was that " 'It did not become and should not have become reasonably apparent to plaintiff that he had an injury on account

of which he would have been entitled to Workmen's Compensation benefits.' "

The majority in their opinion state there is substantial evidence to support this finding, and that the Court of Appeals in reversing the trial court has ignored the substantial evidence rule. The Court of Appeals apparently predicated its reversal of this finding upon the fact that the evidence in support of the finding, if any, was medical evidence upon which plaintiff did not rely. The majority in their opinion state that if such reliance be of any consequence it can reasonably be inferred from the fact that plaintiff twice returned to the duties of his employment.

I must agree with the Court of Appeals, but I would do so upon the ground that plaintiff's sworn testimony amounted to a judicial admission of facts which required a determination that it had become reasonably apparent to him in 1964 that he was unable to some percentage-extent to perform the usual tasks in the work he was performing at the time of his injury and was unable to some percentage-extent to perform any work for which he is fitted.

The record clearly indicates, and no suggestion has otherwise been made, that plaintiff was in full possession of his mental faculties when he testified; he has sufficient intelligence and command of the English language to fully understand the purport of the questions asked of him and his answers thereto; he was testifying to facts peculiarly within his knowledge and about which he could not reasonably have been mistaken, and not about opinions, estimates, appearances or inferences; his testimony was clear and unequivocal; and he made no retraction, modification or explanation of his testimony which would indicate he had testified by mistake or inadvertence.

Under these circumstances, whether he was testifying truthfully or falsely, he should be bound by his testimony, and he should not be permitted to rely upon possible contradictions by other witnesses or possible inferences to the contrary from other evidence. He should not be allowed to recover on a finding which requires a conclusion that he perjured himself.

I appreciate that there are varying views as to the effect of a party's disserving testimony, and that difficulty arises at times in determining whether a statement by a party constitutes a judicial admission which the party will not be permitted to contradict. However, the view of most jurisdictions is that under certain conditions a party will be bound by his testimony, and he will not be allowed to recover on a finding which is predicated upon other evidence to the contrary. See the following, which are a few of the relatively recent cases in which this question has arisen: Bolam v. Louisville & Nashville Railroad Company, 295 F.2d 809 (6th Cir. 1961); Carter v. Winter, 32 Ill.2d 275, 204 N.E.2d 755 (1965); Motta v. Mello, 338 Mass. 170, 154 N.E.2d 364 (1958); Bradshaw v. Stieffel, 230 Miss. 361, 92 So.2d 565 (1957); Picarella v. Great Atlantic & Pacific Tea Company, 316 S.W.2d 642 (Mo.Ct.App. 1958); McNish v. General Credit Corporation, 164 Neb. 526, 83 N.W.2d 1 (1957); McLane v. Stillmaker, 103 Ohio App. 255, 143 N.E.2d 610 (1957); Bockman v. Mitchell Bros. Truck Lines, 213 Or. 88, 320 P.2d 266 (1958); Ford v. Robinson, 76 S. D. 457, 80 N.W.2d 471 (1957); Eidson v. Perry National Bank, 327 S.W.2d 683 (Tex. Civ.App.1959); Suniland Furniture Company v. Pruitt, 347 S.W.2d 835 (Tex.Civ. App.1961); De Vas v. Noble, 13 Utah 2d 133, 369 P.2d 290 (1962); J. A. Jones Construction Company v. Martin, 198 Va. 370, 94 S.E.2d 202 (1956); Smith v. Virginia Electric and Power Company, 204 Va. 128, 129 S.E.2d 655 (1963).

It is my judgment that plaintiff's testimony in the present case was such as to preclude his recovery, and that the above stated essential finding of the trial court could not be supported under the law applicable in most jurisdictions. It would unduly lengthen this dissent to quote all of plaintiff's testimony upon which I base my

opinion, but the following is a portion thereof:

"Q. Now what part of your body was bothering you after you went back to work in January of '64?

"A. Right up here to the top of my shoulder.

"Q. And how was it bothering you? What difficulty was it causing you?

"A. Every time I tried—every time I stretch out my arm to try to pick up something this whole muscle in here started jingling just like a bunch of ants crawling up and down and it don't seem to get away. I can't put no tension or pick up anything that way [weigh] four or five pounds. I can feel that, so I just can't do nothing. I can't pick up nothing.

"Q. Did it cause you any pain when you tried to pick up heavy objects?

"A. It does.

"Q. Did it cause you pain then?

"A. Yes.

"Q. Now how did you do your job? How did you do your work?

"A. Well I had to do it the best I could. Sometimes I used to work with my left hand, my left arm, more than the right and there was pain on that arm. I would let it rest a while and I kept going the same way. I was crippled in this arm ever since then.

"Q. Did your fellow employees, the other people that were working with you try to help you out any?

"A. They did."

"* * *

"Q. Now did you ever request light duty back in '64?

"A. I did. As a matter of fact, all the doctors that I went to they gave me a light duty slip and I turned it into the office and they have told the company about it. They don't accept it, though."

"* * *

"Q. Now were these symptoms always the same from '63 to right up to '68?

"A. Always the same."

"* * *

"Q. And you returned to work in the same capacity that you had before this accident on January 8th, 1964, is that about right?

"A. That's right.

"Q. You went back as a machine, I'm sorry, as a Mechanic #1?

"A. Yes, sir.

"Q. Doing the same duties that you had before?

"A. Same thing, yes.

"Q. But its your opinion and your feeling that the operation didn't do you any good? You are still having the same trouble with your arm?

"A. That's right.

"Q. And you felt that you could only do light work?

"A. That's right.

"Q. And the doctor had told you this, you say?

"A. He gave me a light duty slip.

"Q. But you went back to light duty?

"A. They wouldn't—the company wouldn't give me that.

"Q. You did go back to the same duty?

"A. The same work, yes.

"Q. And your arm never got better, did it?

"A. No."

"* * *

"Q. But that arm never got well, is that right?

"A. It never got well. My left arm is the one I did most of the work with.

"Q. All this time you had difficulty with that right arm?

"A. The right shoulder.

"Q. The right shoulder?

"A. Yes.

"Q. Not your right arm?

"A. The right shoulder.

"Q. All right, but it never gave you any peace from '63 on into until you went for the operation in January of 1968 is that right?

"A. Yes, that's right."

"*  *  *

"Q. And your problem today is the right arm and you say your right shoulder is the same now as it was right after the accident of November of 1963, is that right?

"A. That's right.

"Q. And all this time from 1963 until October 1968 you have requested light work and it was always refused to you?

"A. I have requested light work and it was recommended by all the doctors that I have gone to.

"Q. The doctors told you what your condition was and you discussed your condition with each one of these doctors, did you not?

"A. No.

"Q. Sir?

"A. How was that?

"Q. You talked to each one of these doctors? What was wrong with you?

"A. Certainly. I sure did.

"Q. And they told you what was wrong?

"A. Right.

"Q. So at all times you would go to these doctors they would tell you what they found?

"A. They tell me just what is wrong. They can't do nothing about it.

"Q. Then did you go get light duty?

"A. They gave me a slip. Its in black and white.

"Q. And this was the case all the way through 1964, '65, '66, '67 and '68?

"A. Certainly.

"Q. All the way through that period?

"A. Each time I went to a doctor, yes."

For the foregoing stated reasons, I respectfully dissent.