710 P.2d 738

**Cecil Dale SHADBOLT,
Plaintiff-Appellee,**

v.

**SCHNEIDER, INC. and CNA Insurance
Companies, Defendants-Appellants.**

No. 8069.

Court of Appeals of New Mexico.

Aug. 20, 1985.

Byron Caton, Tansey, Rosebrough, Roberts & Gerding, P.C., Farmington, for defendants-appellants.

William H. Carpenter, Carpenter Law Offices, Ltd., Albuquerque, for plaintiff-appellee.

## OPINION

HENDLEY, Judge.

Plaintiff, a quadriplegic as a result of a stroke, was awarded total disability benefits, medical expenses, and attorney fees under the Workmen's Compensation Act. Defendants' appeal raises the following issues: 1) whether there was substantial evidence to support the trial court's finding on causation; 2) whether the plaintiff's injury arose out of his employment; 3) whether the award of medical expenses for the care provided by plaintiff's wife was excessive; 4) whether the district court erred in making evidentiary findings; 5) whether the district court clerk taxed costs inconsistently with the trial court's ruling; and 6) whether the attorney fee award was an abuse of discretion. We affirm.

Defendants challenge the district court's findings as being unsupported by substantial evidence. We review the evidence in accordance with the appropriate appellate standard regarding substantial evidence. That standard requires us to review the evidence in the light most favorable to support the findings. *Duran v. New Jersey Zinc Co.*, 83 N.M. 38, 487 P.2d 1343 (1971).

Plaintiff worked as a construction worker at a power plant. He had high blood pressure before he began working for defendant Schneider, Inc. Plaintiff began to experience difficulties at Schneider when McMillan became the foreman. Plaintiff testified that he and McMillan had repeated disagreements over McMillan's failure to follow safety rules. This testimony was corroborated by the testimony of Labossiere, a co-worker. Plaintiff claimed McMillan rushed the crew; plaintiff and McMillan also argued over the lack of "chokers" on the rigging, the overloading and positioning of cranes, the use of apprentices for tasks "in the air" for which they were inadequately trained, and the failure of McMillan to oversee the work and guard against unsafe situations. Plaintiff con-

fronted McMillan with his concerns and then tried to have something done through the shop steward.

Plaintiff also testified that he was extremely concerned about the safety situation because he had seen others killed in this type of work. About one and one-half weeks after McMillan became foreman, plaintiff started to have headaches. These headaches followed incidents where he became angry or upset at work. On one occasion, after a crane nearly tipped over, plaintiff got a severe headache and vomited.

On the day before Thanksgiving, plaintiff's crew was given the task of installing a large duct. The duct weighed seven or eight tons. According to plaintiff and Labossiere, McMillan insisted on using an improper method of installing the duct. Finally, on the third attempt, the duct was properly installed. The crew was so upset by this incident that they decided to walk off the job.

Before the crew had left the work site, the superintendent approached and attempted to calm them down, telling them that everything would be worked out when they returned on Monday. At that pont, McMillan approached and said, "Let's settle this right now." There was a verbal confrontation between plaintiff and McMillan. Plaintiff started to walk away and then suddenly collapsed. No issue was raised at trial or on appeal that plaintiff comes within the "going and coming" rule. *See* NMSA 1978, § 52–1–19. Plaintiff was taken to the hospital and, within twenty-four hours, was completely paralyzed.

**Causation**

■ Defendants claim there was insufficient evidence to support the trial court's findings on causation. Defendants' theory is that the cause of plaintiff's stroke cannot be identified. They contend that the medical evidence established that there were certain "risk factors" that might have contributed to the stroke and that no one factor can be proved to have been the direct cause. Defendants also claim that plaintiff did not actually have a stroke at work. They contend that plaintiff was only suffering from the temporary effects of a transient ischemic attack when he collapsed at work, that he fully recovered from this event, and that the actual stroke, which was inevitable and which was not work connected, occurred while plaintiff was in the hospital. There was sufficient evidence upon which the trial court could have relied to reject these arguments.

Dr. Miller, a neurosurgeon, testified for plaintiff. Dr. Miller based his opinion upon the depositions and plaintiff's medical history. Dr. Miller knew of plaintiff's working conditions, his personal life, and his hypertension. Dr. Miller viewed plaintiff as a young man with hypertension who reacted severely to certain work episodes. Plaintiff's headaches were transient episodes produced by painful spasms of the cerebral artery. On plaintiff's last day of work, he "had the episode which has left him in his present condition." Each transient episode contributed to plaintiff's present condition, but the events on the last day of work produced "the straw which broke the camel's back." The plaintiff suffered a stroke at work, the effects of which progressed after he was taken to the hospital.

Dr. Miller felt that plaintiff was susceptible to stroke because of hypertension aggravated by work stress. It was probable, but not inevitable, that a stroke would have eventually occurred. However, if plaintiff had not been subject to acute stress at work, the stroke would certainly have been delayed and possibly averted altogether.

Dr. Miller described in detail the physiological process he believed produced plaintiff's stroke. Anger produces "acute stress" which can cause blood vessels to spasm, raise blood pressure, and increase the coagulability of the blood. The blood flow is retarded when the thickened blood is forced to run through the narrowed blood vessel. In this event, a clot may form, and the area supplied by the blood vessel will die. In Dr. Miller's opinion, this process began at work and continued after plaintiff had been taken to the hospital.

On cross-examination, Dr. Miller rejected defendants' theory of causation. Defense counsel attempted to get Dr. Miller to admit that none of the risk factors for stroke could be isolated as a direct cause. Dr. Miller disagreed, stating that although various factors played a role in plaintiff's stroke, the precipitating episode was the series of stressful events on the day of the stroke. Dr. Miller also expressly rejected the defense theory that plaintiff experienced only a transient attack at work. True, there was some recovery after plaintiff was taken to the hospital, but it was only superficial, due, perhaps, to some temporary collateral circulation. Even during this temporary recovery, plaintiff continued to have numbness, indicating that the stroke had begun at work.

Defendants' appellate issues on causation are answered by existing New Mexico case law. A stroke causally connected to the worker's job is compensable. *Salazar v. County of Bernalillo*, 69 N.M. 464, 368 P.2d 141 (1962). If work stress creates a physical injury, the injury is compensable. *Little v. J. Korber & Co.*, 71 N.M. 294, 378 P.2d 119 (1963) (emotional upset caused heart attack); *Salazar; Crane v. San Juan County, New Mexico*, 100 N.M. 600, 673 P.2d 1333 (Ct.App.1983) (work stress caused high blood pressure which caused hemorrhage in eye). A preexisting condition, such as hypertension, which makes the workman more susceptible to injury, does not preclude recovery. *Little v. J. Korber & Co.* (arteriosclerosis); *Salazar* (hypertension); *Bufalino v. Safeway Stores, Inc.*, 98 N.M. 560, 650 P.2d 844 (Ct.App.1982) (arteriosclerosis). If medical experts disagree on causation, it is up to the trier of fact to resolve the conflict. *Crane* (defendants argued that work and family stress were equally probable causes); *Turner v. New Mexico State Highway Department*, 98 N.M. 256, 648 P.2d 8 (Ct.App.1982); *Bufalino.*

Defendants also argue that when anger produces an injury, there has been no accident within the terms of the Act. This is incorrect. *Little; Salazar.* This argument would have merit if plaintiff's anger had not been reasonably related to his employment (*i.e.*, if it did not "arise out of" his employment or if it was not "in the course of" his employment). The trial court found that "[t]he tension and disputes were not a matter of personality conflicts personal to Mr. Shadbolt, but were disputes in good faith concerning what was in the best interest of the job and the men from a safety standpoint." This finding is supported not only by the testimony of the plaintiff and Labossiere but also by the fact that the entire crew walked off the job on the day of the stroke. Given the court's findings, there is no difference between this case and *Little v. J. Korber & Co.*, where the workman was "storming" over an error in a charge ticket, or *Salazar*, where the workman threw a "tantrum" over the conduct of one of his probationers.

## "Arising out of"

Defendants argue that the "[t]hreshold question in this case is whether plaintiff's walking off or termination of his job was a 'risk' incident to plaintiff's employment." Defendants rely upon *Kern v. Ideal Basic Industries*, 101 N.M. 801, 689 P.2d 1272 (Ct.App.1984). In *Kern*, this Court held that a mental breakdown caused by termination from a job did not arise out of employment and, thus, was not compensable. A physician testified that Kern's illness was caused "by the trauma that he suffered at the loss of the job, not based on the job itself." The Court reasoned that, in order to satisfy the " 'arising out of' " requirement, the disability must have resulted from a risk that was " 'incident to' " the work itself, or " 'peculiar to the employment,' " or "increased by the circumstances of the employment." Because termination of employment is something faced by all those who are employed, the risk of termination is not peculiar to any particular employment.

Defendants' reliance on *Kern* is misplaced. If the trial court had found that the stress leading to plaintiff's stroke was

solely the result of anxiety over termination, the defendants' argument would have merit. However, the trial court found that the stroke was a result of "on the job stress" resulting from a "safety-related incident." The testimony set out above, that plaintiff's stress was due to the dispute over the placement of the duct and prior disputes over other aspects of the job, is substantial evidence to support these findings. These disputes were not inevitable consequences of employment, but, rather, were peculiar to plaintiff's employment; *i.e.*, the disputes were based on the work itself. Thus, unlike the situation in *Kern*, the stress arose from the performance of plaintiff's duties of employment.

### Compensation for Care Provided by Plaintiff's Wife

■ The judgment awarded $125,776.00 for "sub-professional nursing type care and maintenance to the date of trial ... as remdered [sic] by Darlene Shadbolt, wife of the claimant." The trial court also directed the defendants to pay for all future reasonable medical and nursing/maintenance expenses arising from the stroke. Defendants do not dispute that Mrs. Shadbolt's services are reasonable medical services, NMSA 1978, Section 52–1–49(A), for which they are obligated to pay. Under the majority view, a disabled workman can recover for necessary medical services rendered by a spouse. 2 A. Larson, *The Law of Workmen's Compensation* § 61.13(d) (1983). Defendants dispute only the reasonableness of the amount awarded. They concede that Mrs. Shadbolt should be compensated for one eight-hour shift on the basis of the cost of licensed care, but they contend that, for the remainder of the day, she should be compensated only at a lower rate and only for the actual care provided. The argument that Mrs. Shadbolt should be compensated at a lower amount is based upon the contention that her services are unskilled. The argument that Mrs. Shadbolt should be compensated only for actual work done is based upon the fact that, although care is required twenty-four hours a day, Mrs. Shadbolt is not actually performing tasks for her husband for the entire twenty-four-hour period.

Dr. Miller testified that plaintiff cannot take care of his personal needs. He needs help in communication, in being moved to prevent pressure sores, in washing and dressing, in being fed, and in being cleaned after bowel and urine evacuations. He also testified that plaintiff requires physical therapy. If plaintiff did not have a wife to care for him, he would require an attendant twenty-four hours a day. Dr. Miller testified that trained personnel would be preferable. In his opinion, Mrs. Shadbolt had done a good job in caring for her husband.

Dr. Cilo testified that plaintiff requires "total care" twenty-four hours a day. Dr. Cilo thought that plaintiff needed a caring, mature person who had common sense and who could learn the "basic skills" that were required. He believed that plaintiff did not require "professional nurses," but that the level of care provided by a licensed practical nurse was appropriate. Dr. Cilo thought that it was inappropriate in a marital relationship for a wife to provide total care for a totally dependent husband because the wife should be able to have a life outside of the home. Without a wife to care for him, plaintiff would need someone there twenty-four hours a day.

Mrs. Shadbolt testified as to the care she provides for her husband. When plaintiff first returned home from the hospital, a nursing service took care of him for eight hours a day. Mrs. Shadbolt was working outside the home at that time, but cared for her husband for the remaining sixteen hours of the day. The Shadbolts could not afford the requisite $800 a week for the nursing service, so the service was discontinued, and Mrs. Shadbolt was forced to quit her job. Since then, she has provided care for plaintiff around the clock. Mrs. Shadbolt was trained at the Craig Rehabilitation Institute in tracheotomy and gastrostomy care, physical and speech therapy, bladder and bowel care, skin care, and oral hygiene. Every day, Mrs. Shadbolt cooks for, feeds, shaves, bathes, and dresses her

husband. In addition, throughout the day, she exercises him, moves him from the bed to the couch and back again, administers physical therapy and breathing treatments (every four hours), takes care of his bladder and bowel functions, and shifts his position to prevent pressure sores from forming. During the night, she awakens every three hours to turn him. Mrs. Shadbolt testified that the care she provides for her husband has left her very tired, that she has little time left over to devote to her children, and that she has no time left for herself.

Defendants do not challenge the trial court's finding on the hourly rate for semi-skilled nursing services. Defendants do argue that plaintiff does not require a semi-skilled nursing attendant and that, therefore, it is inappropriate to compensate Mrs. Shadbolt at the rate a semi-skilled nurse would receive. The reasonableness of the cost of medical services is a question of fact. *See Valdez v. McKee*, 76 N.M. 340, 414 P.2d 852 (1966); *Gregory v. Eastern New Mexico University*, 81 N.M. 236, 465 P.2d 515 (Ct.App.1970).

The evidence set forth above supports the trial court's finding that plaintiff required the assistance of a trained nursing assistant and that Mrs. Shadbolt provides those services. Indeed, defendants admit that compensating Mrs. Shadbolt at the rate for semi-skilled nursing care for one shift would be appropriate. Mrs. Shadbolt's testimony was that these services are required throughout the entire day. The trial court awarded $4 per hour for the period during the night when Mrs. Shadbolt only has to turn her husband every three hours. The trial court's determination of the rate of compensation of Mrs. Shadbolt's services was supported by substantial evidence. *See Novotny v. St. Paul United Methodist Church*, 338 N.W.2d 266 (Minn.1983) (proper to compensate wife based upon applicable rate of skilled nursing care); *City of Kosciusko v. Graham*, 419 So.2d 1005 (Miss.1982) (appropriate to compensate wife for care of paraplegic husband at rate applicable to licensed practical nurses); *Mamone v. Griege*, 74 A.D.2d 656,

424 N.Y.S.2d 782 (1980) (award that compensated worker for two nursing shifts per day at rate applicable to registered nurses and one nursing shift per day at rate applicable to practical nurses affirmed).

Defendants' next argument is that, even if the rate of compensation is reasonable, it was error to order compensation based upon eight-hour shifts instead of upon the time it actually takes to perform the necessary tasks. One problem with this argument is that defendants did not request an appropriate finding. The more fundamental problem with this argument is that it ignores the reality of the situation: a semi-skilled nursing assistant would be compensated at an hourly rate irrespective of how much care plaintiff required during that time.

In rejecting this same argument, the court in *Texas Employers Insurance Association v. Choate*, 644 S.W.2d 112 (Tex. App.1982), stated:

> Mrs. Choate cannot set aside 40 minutes a day, take care of Choate and then go on to other things. She must be available to meet his needs during the entire time he is at home and awake. As the company's own witness admitted, a third person hired to do what Mrs. Choate does could not be hired or compensated on the 40 minutes per day basis now advanced by the company; instead such a person would be hired by the day or the week and paid for the time during which he or she is available, not just the time spent actually helping Choate.

The court in *Filion v. Art Himbault Trucking Co.*, 103 Mich.App. 471, 302 N.W.2d 892 (1981), rejected a similar argument with respect to a plaintiff's parents:

> Even if the specific functions performed by plaintiff and her husband could be accomplished in less than 8 hours a day, the parents must nonetheless be available throughout the day and night. There was no error in the award to plaintiff of compensation based on eight-hour periods.

The trial court properly awarded compensation based upon eight-hour shifts because that is how those services would have to be purchased if Mrs. Shadbolt refused to provide them. "That a 'conscientious' spouse may in fact perform these services does not diminish the employer's duty to compensate him or her as the person who discharges the employer's duty to provide them." *Kushay v. Sexton Dairy Co.*, 394 Mich. 69, 228 N.W.2d 205 (1975). *See also Davis v. Stuart*, 414 So.2d 593 (Fla.App. 1982).

**Improper Findings**

◼ Defendants ask that findings six through thirteen be stricken because they are evidentiary findings, not ultimate findings. Significantly, defendants do not claim that any specific ultimate fact was not found; they complain only that the trial court erred in making detailed evidentiary findings. Assuming that findings six through thirteen are merely evidentiary findings, reversal is not necessary. In a complicated case, it is not error for the trial court to include some evidentiary findings in the findings and conclusions. *Stroope v. Potter*, 48 N.M. 404, 151 P.2d 748 (1944). What are the ultimate and what are the evidentiary facts often presents a close question.

◼ Defendants next complain that the trial court did not exercise independent judgment. Although most of the court's findings were taken verbatim from plaintiff's requested findings, the fact that some of defendants' requested findings were adopted demonstrates that the judge read the requested findings and exercised independent judgment. Absent some indication of the abdication of judicial responsibility, even the adoption of verbatim findings is not error if they are supported by the record. *Coulter v. Stewart*, 97 N.M. 616, 642 P.2d 602 (1982); *In re Hamilton*, 97 N.M. 111, 637 P.2d 542 (1981); *United Nuclear Corp. v. General Atomic Co.*, 93 N.M. 105, 597 P.2d 290 (1979).

**Other Issues**

◼ Defendants challenge the amount of the costs which were taxed. We do not reach this issue because the docketing statement did not raise any issue with respect to costs. *See State v. Aranda*, 94 N.M. 784, 617 P.2d 173 (Ct.App.1980); *State v. Jacobs*, 91 N.M. 445, 575 P.2d 954 (Ct.App.1978).

Defendants challenge the award of $62,-500 attorney fees on three grounds: first, that the trial court's finding number forty-eight contains incorrect present value figures, and that only one figure can be used; second, the evidence will not support the hourly rate utilized; and, third, the award is excessive when considered in light of awards in similar cases.

As to the first contention, the trial court found that "the present value of the award is $582,377.00 for compensation and accrued medical and related benefits, together with $5,260,879.00 as the present value of future medical and related care over the life expectancy of plaintiff * * * assuming a 40-year life expectancy." The $582,377 represents the total of the present value of compensation of $112,503, accrued and unpaid medical expenses of $344,098, and accrued and unpaid nursing care provided by plaintiff's wife of $125,776, discussed above.

◼ While acknowledging that recovery of medical expense provides a basis for an award of attorney fees, *Schiller v. Southwest Air Rangers, Inc.*, 87 N.M. 476, 535 P.2d 1327 (1975), defendants argue that cases considering present value have not included the value of medical expenses. One of the factors to be considered in awarding attorney fees is "the present value of the award." *Jennings v. Gabaldon*, 97 N.M. 416, 640 P.2d 522 (Ct.App.1982). We do not understand that factor to include medical expense only where it represents the sole basis of the award. The present value relates to all benefits, including medical and related expenses.

◼ We agree with defendants that the trial court could not consider future medical expenses. *Board of Education of the Espanola Municipal Schools v. Quintana*,

102 N.M. 433, 697 P.2d 116 (1985). However, the trial court's independent determination of the present value of the award, $582,377, was correct and supported by the evidence. Thus, the portion of the finding reciting future medical expense of $5,260,879 was unnecessary to support the judgment and its inclusion does not require reversal. *See Specter v. Specter*, 85 N.M. 112, 509 P.2d 879 (1973).

 Defendants' second challenge regarding the hourly rate requires a review of the tapes. The tapes of the attorney fee hearing have not been sent up. Even though it is the obligation of the district court clerk to transmit the tapes to this Court, NMSA 1978, Crim., Child.Ct., Dom. Rel. & W/C App.Rule 208(b) (Repl.Pamp. 1983), it is still the burden of the appellant to ensure that the tapes necessary for review are sent up. *Berlint v. Bonn*, 102 N.M. 394, 696 P.2d 482 (Ct.App.1985). In the absence of a record, there is nothing to review. *State v. Hall*, 103 N.M. 207, 704 P.2d 461 (1985).

 Defendants' third challenge invites comparison with awards in similar cases. Without citing to any authority, defendants claim there "are dozens of cases reported" in which lesser amounts have been awarded. We do not agree that comparison with other cases is the proper means to determine the reasonableness of the amount awarded. Each case must be judged on its own merits. We are satisfied that all of the *Fryar I* (*Fryar v. Johnsen*, 93 N.M. 485, 601 P.2d 718 (1979)) factors were considered and justified the award made. The complexity and intensity with which the case was tried prompted the trial court to note in one finding that "the adaquacy [sic] of the presentation in court tends to rise to the level of competition, and this was from both sides one of the most diligently researched and professionally presented New Mexico workmen's compensation case [sic] to date." Moreover, we observe that the award represents sixteen percent of the total present value which falls within the range discussed in *Woodson v. Phillips Petroleum Co.*, 102 N.M. 333, 695 P.2d 483 (1985).

We will not overturn the award of attorney fees.

Plaintiff is awarded $4,000 plus gross receipts tax for attorney fees on appeal. Defendants shall bear the costs on appeal.

Affirmed.

IT IS SO ORDERED.

BIVINS and MINZNER, JJ., concur.