**John Rolfe GASSMAN, Plaintiff and Respondent,**

v.

**Earl N. DORIUS, Director, Driver License Division, Department of Public Safety, Defendant and Appellant.**

No. 13849.

Supreme Court of Utah.

Nov. 25, 1975.

Vernon B. Romney, Atty. Gen., Bernard M. Tanner, Asst. Atty. Gen., Salt Lake City, for defendant and appellant.

Don Blackham and Mikel M. Boley, Granger, for plaintiff and respondent.

HENRIOD, Chief Justice:

Appeal from a judgment in favor of Respondent declaring that under the facts adduced, Gassman had not violated the provisions of Title 41–6–44.10(a) of the Motor Vehicle Act, Utah Code Annotated 1953. Affirmed.

Believable admissible evidence favorable to the decision, which the lower court appears to have indulged, briefly may be stated as follows:

Respondent was stopped by a peace officer about 12:45 a. m. after the former had made an unlawful right turn onto a highway that at the time carried very little traffic. The officer detected an odor of alcohol and gave plaintiff a so-called "field test" that he deemed sufficiently probative to justify an arrest for driving under the influence. He placed plaintiff Gassman under arrest and immediately, *and before any request by the officer or any alleged refusal to take a chemical test,* read the "implied consent" provision of the act and the "Miranda" warning to him. Thereafter, the trooper asked, "Mr. Gassman, what is your response to my request that you submit to a chemical test?," to which Gassman responded, "Yes, I will take a blood test. Also, I want my physician to be there."

The officer then and there at the scene asked Gassman who his physician was and then called the dispatcher and *asked the latter* to call Dr. Poulsen and have him meet "them" at the jail "where we take the blood tests." At that same time he also asked the dispatcher to call Mr. Davis, the City-County Health Technician,[1] or whoever was on duty to take the test.[2] It was

---

1. Undoubtedly the same Mr. Davis that recently this court, in *Gibb v. Dorius*, Utah, 533 P.2d 299 (1975) decided was not qualified under 41–6–44.10(f) to give a blood test.

2. Which obviously would be a blood test, the evidence showing that Gassman and the officer both agreed to such a test after the arrest, plus the officer's testimony to the effect that

reported that Dr. Poulsen could not be located. Another try to locate him was made when the officer and Gassman arrived at the jail, at around 1:30 a. m. The latter refused to follow a suggestion that Dr. Poulsen's brother, Jerry, conduct the test. "No way do I want him to take my blood," he said, for personal reasons. At the jail, the officer called the answering service, a Miss Simpson, and she said the same as the dispatcher, that they could not locate Dr. Poulsen.

The officer suggested that Gassman try to call Dr. Poulsen and Gassman said, "If you can't get him, obviously I can't get hold of him." The officer said, "Let's forget about the blood test *for the moment.* . . . Here is a breathalyzer in the other room. Will you come in and take the breath test." Gassman said he would not. At that moment the county technician walked in, and the officer walked out, saying, "Okay" and "I just left; left the jail," at 2:00 a. m., which was an hour after his regular 1:00 a. m. quitting time, and about 1 and ½ hours after the arrest. There was no further effort made to contact Gassman's physician, and Gassman at no time asked to consult an attorney.

On cross-examination, the officer said that Gassman stated he would submit to a *blood* test, and that he, the officer, told Gassman that his physician could make a test *in addition to the county technician* who customarily took the tests. He continued by saying that the latter was not a physician, nor a registered nurse, and that he did not know whether or not he was a duly qualified "laboratory technician."[3] At that juncture Gassman said he would take the blood test. The officer had said "I asked him to take the breathalyzer *or a blood test when I read him his rights,"* and "He responded he would take the blood test," and "I don't recall whether I recommended blood test or not. He responded

he would take the blood test," and "I didn't explain anything about the breathalyzer test." He further testified that if a breath test were to be given, "I intended to give him the breathalyzer test." Gassman, on the other hand, protested the officer's administering the breath test, saying he believed he would not be impartial in giving him such test. The officer did *not* read him any "rights," or "obligations,"—either "Miranda" or "implied consent" *after* Gassman had "refused," or "qualifiedly refused" the breath test that the officer "chose" to administer after already having chosen and agreed to a blood test.

The trial court granted Gassman's petition and eliminated the revocation order.

Each case is based on its own facts,[4] and we do not reverse the trial judge unless he clearly does violence to the facts as they relate to his findings. We believe and hold that his finding here that "the petitioner did not unreasonably refuse to submit to a sobriety test, but did in fact request a blood alcohol test," amply was supported by competent evidence.

Although Gassman asked for and agreed to submit to a blood test, and also said "Also I want my physician *to be there"* (not conditioning the test to one where his own doctor conduct it), he did not actually refuse to take the blood test,—even after a technician had walked in almost simultaneously with the officer's apparent insistence on a *breath* test to be conducted by him, the officer,—no one else. He actually did not refuse even the breath test (a test he had never before taken), since anything that could be said to have been a refusal was based on the reason given by Gassman that he didn't believe the peace officer would be impartial,—a perfectly logical and quite understandable reason for a man to espouse who is under arrest, charged with a serious offense, not yet tried,—a situation in which he finds himself, at the

---

3. See footnote 1.

were it to be a breathalyzer test, he would be the one to conduct it.

4. *Hunter v. Dorius,* 23 Utah 2d 122, 458 P.2d 877 (1969) : "Based upon these facts . . . the decision of the lower court is amply supported by the evidence and is affirmed."

asserted and statutory insistable mercy of one who already has indicated plaintiff was guilty of an offense by the fact of arresting him, only to insist further that he, the officer, could and would officiate at the rites that well might result in the accused's giving evidence for or against himself, albeit by statutory consent born of the conditioned privilege of using the state's highway.

Neither is there any evidence to the effect that Gassman was stalling for time, since one of the first things he did was to agree to the test and ask that his personal physician be present at the christening or at the pre-interment viewing of the deceased, as you wish,—and the total elapsed time before the officer took off from the jailhouse, and consequently foreclosed any further effort to conduct a test, was a little over an hour,—or an hour and a quarter,—leading to the suggestion that the officer, in leaving, was more concerned with the time factor than was the accused one. This is particularly true when it is pointed out that the officer left an hour and a half after the arrest and an hour after his regular quitting time. The whole tenor of the evidence prompts one to feel that Gassman justifiably believed he could rely on a stipulated blood test and not a second-guessed and second-chosen breath test.

Particularly should the court find, as it did, because the statute requires reading one's "rights" *after* the refusal to take the test, which the officer completely failed to do. It is no answer to say anyone waived such statutory provision because at the time of arrest there was such reading.

Under the believable facts, we think and hold that the trial judge well may have been remiss had he stamped approval on a revocation here, where the officer did not strictly adhere to a statute that hovers perilously near a situation that could sublimate and endorse as inviolate one man's prerogative to procure evidence as he might choose,—thus casting himself at once in the multiple roles of accuser, procurer of the evidence which *he* alone may aspire to develop, and as a consequence of which, he conclusively could bind his fellow actors,—the veniremen and the judge.

It is interesting to note that the act under which a revocation is sought here has had a troubled and dubious history and a possible predictable further emasculation.

In 1961, the subject act, Title 41–6–44.10, U.C.A.1953, did not have the language it now contains, to the effect that "The arresting officer shall determine within reason which of the aforesaid tests (blood or breath) shall be administered." At that time there was nothing in the act to say who should make a choice and the tests then were "breath, blood or urine." In construing the act, in *Bean v. State,* 12 Utah 2d 76, 362 P.2d 750 (1961), this court said: "The *Ringwood* case [5] clearly indicated that the choice was that of the subject and the failure to allow such choice resulted in ordering the reinstatement of the revoked license." In 1967, L.U.1967, Ch. 88, almost obviously in circumvention of *Ringwood* and *Bean*, the present language about choice was inserted as an authority and "urine" eliminated as a test. At one time "saliva" had been one of the tests, but earlier it was eliminated. In light of the disapproval of the "breath" test in a number of areas, Gassman, a dentist,—certainly knowledgeable in basic medicine,—well may have had legitimate qualms about such a test,—that well might be on the way out as were "urine" and "saliva" tests in this jurisdiction. At least the trial court could have concluded that his so-called "refusal" of the breath test was a qualified or quasi-refusal. But there is no question but that the evidence does not reflect a refusal, —but on the contrary,—a consent to take the blood test which the accused (as in *Ringwood* and *Bean*) and the officer (under the statute) *both* chose, all of which leads us to the conclusion that we must respect the judgment of the trial court if

5. 8 Utah 2d 287, 333 P.2d 943 (1959).

supported by substantial evidence, as appears to be the case here,—which we do in consonance with traditional and accepted rules touching appellate review.

It is significant to note that any delay in taking any kind of suggested test was not caused in any way by the plaintiff, except for the fact he asked that his physician be present, and that any delay (which seems to have been minimal here) was occasioned by the officer's arrest, field test, transportation to the jail and filling out papers,—and that so far as this record is concerned, Gassman was prepared to take the test at any time his physician was present. The officer did not suggest that Gassman take the test at the time the so-called technician arrived and did not try to contact the physician at least one more time.

The dissent asserts that Dr. Gassman "was requested to submit to a test on three occasions," once at the scene of arrest, the second and third at the jail. He professed to take a test but only on his own imposed conditions, viz: That his own physician be present, and this after he knew the physician was not available.

The above is a paraphrasing of the evidence that entirely cannot go unchallenged. The record reveals that he was requested to submit to a chemical test twice, not thrice, once at the arrest, concerning blood, once at the jail, concerning breath. He promptly agreed to a blood test at the arrest and said he wanted his physician present. The officer agreed to such a blood test and even had a technician called to give the test, without saying the physician could or could not be present, but only that the latter could give an *additional* test. The second request had to do with a breath test, which he was asked to give at the jail, which he refused,—stating in his brief that his reason was that he felt the officer would not be impartial. He did not "profess he was willing to take a blood test." He said, "I *will* take a blood test." He did not say this "on his own imposed conditions" but only said, "I want my physician to be there," which cannot be said to be tantamount or synonymous with "I *demand*." The statement of the dissent that he made such statements "after he knew the physician was not available" simply appears to be inaccurate and an unwarranted implication of some kind of trickery since there was no attempt to call the physician and the latter was not found to be unavailable until *after* the conversation reflected above.

TUCKETT and MAUGHAN, JJ., concur.

ELLETT, Justice(dissenting).

I am unable to concur in affirming the judgment. The trial court undoubtedly was influenced by the case of *Hunter v. Dorius*.[1] There the plaintiff hit a guard rail at 7:40 p. m. The officer arrived on the scene at 8:00 p. m., and after observing the driver of the vehicle, Mr. Hunter, placed him under arrest at 8:25 p. m. The officer requested Mr. Hunter to take a sobriety test. Mr. Hunter refused to take it until he got in contact with his lawyer. Phone privileges were afforded, but the lawyer was out of town. He contacted another lawyer, who told him to refuse to take any test at all. He told the officer what the attorney had said and continued to phone. Finally at 10:05 p. m. the officer filled out a "Refusal Form" which set in motion the legal machinery resulting in that appeal to this court.

By that case this court put its stamp of approval on a spurious claim to a right to contact an attorney and the consequent delay involved—even two hours of the officer's time waiting for the plaintiff to take a test.

In this case we need not concern ourselves with the sanctity of the privilege of a trial court to find the facts. It would seem that the trial judge would assume that if this court would allow a drunken

1. 23 Utah 2d 122, 458 P.2d 877 (1969).

driver to delay two hours calling attorneys throughout the state that a like privilege should be accorded to a drunk driver who dallied under the pretext of wanting his doctor to be present.[2]

Mr. Gassman was requested to submit to a test on three occasions, to-wit: Once at the scene of arrest, the second and third at jail. He professed to be willing to take a test but only on his own imposed conditions, viz: That his own physician be present, and this after he knew the physician was not available.

The statute[3] affords a defendant no right to impose conditions and refuse to take the test until those conditions are met. He either must take the test or refuse to take it. His conduct speaks louder than his words. It is common knowledge that the alcoholic percentage in a person's body diminishes with the elapse of time. Thus the arrested person, even while asserting that he is sober, refuses to take the test which would prove his claim and, instead, imposes upon the time of a busy officer for hours by claiming that he will take a test which he never does.

It seems to me that it takes a naive court to fall for that type of shyster trick. It must be a court more interested in protecting the driving privilege of drunks than in the preservation of life and limb upon the highways of this state. In addition to this, the courts should follow the law as it is written. There is no provision in the law for any delay. One either takes the test or he does not. He is not obligated to take it and thereby give evidence against himself. However, when he got his permit to operate an automobile upon the highways of this state, he by law agreed that if he failed to submit to the test, he would lose his right to drive for one year.

The matter of refusing to submit to a test and the legal implications connected therewith are civil matters.

The statute[4] permits an arrested person who submits to a test to have his own physician to administer a test *in addition* to the one given at the direction of the officer. There is no reason for the doctor to be present at the time of the official test, nor is there any reason why an attorney should come down. A lawyer schooled under the holdings of the federal courts would delay as long as possible if he could cause the test to await his arrival.

The number of deaths and injuries upon the highways is staggering to the imagination, and most of them have a drunken driver involved in them.

The term "drunken driver" is a misnomer. One need not be drunk in order to be a menace upon the highway. All that is required is that some of the faculties which he uses in driving his car be affected to some appreciable degree as a result of his having consumed alcoholic beverages.

By affirming the trial court in the instant matter, the majority of this court indicates that the next drunken driver can obtain a long delay by insisting upon the presence of his lawyer, his doctor, his minister, and his wife, ad infinitum, ad nauseam.[5]

I would reverse the lower court.

CROCKETT, J., concurs in the views expressed in the dissenting opinion of ELLETT, J.

---

2. Apparently he was prophetic in his assumption.

3. Section 41-6-44.10, U.C.A.1953 (Replacement Vol. 5A).

4. Section 41-6-44.10(g), U.C.A.1953 (Replacement Vol. 5A).

5. Since an addendum has been added to the prevailing opinion, it is necessary to add this footnote to the dissent.

Mr. Gassman said he would take the blood test, but insisted that Dr. LeVere Poulsen be present. At the jail the officer found that the doctor was not available, but that another doctor, his brother, Jerry Poulsen, was available. When told that Dr. Jerry Poulsen was available Mr. Gassman said, "No way do I want Jerry." Finally the officer said to forget the blood test and take a test with a breathalyzer machine. Mr. Gassman said "No. I will not. No. No."

Since I am apprehensive about being the next victim instead of the next defendant I can count three refusals—although one refusal is all that is required.