John A. BECK, Plaintiff and Appellant,

v.

Tony COX, Director, Driver License Division of the State of Utah, Defendant and Respondent.

No. 15795.

Supreme Court of Utah.

June 29, 1979.

---

4. *State v. Middelstadt,* supra, note 2.

5. See *State v. Turner,* Utah, 572 P.2d 387 (1977).

Littlefield, Ritchey & Cook, David E. Littlefield, Salt Lake City, for plaintiff and appellant.

Robert B. Hansen, Atty. Gen., Bruce M. Hale, Asst. Atty. Gen., Salt Lake City, for defendant and respondent.

STEWART, Justice:

Plaintiff appeals from an order of the district court revoking his driver's license pursuant to Utah's Implied Consent Statute, Section 41–6–44.10, U.C.A.[1] Plaintiff raises the important issue under that statute of what conduct constitutes a "refusal" to take a blood test so as to warrant the revocation of the license of a person arrested for driving under the influence of alcohol or a drug.

The legislature has provided for the revocation of a driver's license of a person who refuses to take a blood alcohol test at the request of a police officer. Section 41–6–44.10(a) provides that a person who operates a motor vehicle in this state is "deemed to have given his consent" to submit to a blood alcohol test when an officer has grounds to believe that the driver was driving under the influence of alcohol or a drug. Section 41–6–44.10(b) provides that if a person has been placed under arrest and has been requested by a police officer to take a breath, blood, or urine test and the driver refuses, then the person shall be warned that a "refusal to submit to the test or tests can result in revocation of his license to operate a motor vehicle." After the refusal and the warning, a person must then request that the test be given. If the driver does not take a test, the police officer is required to file a sworn report stating that he has grounds to believe that the arrested person had been driving while under the influence of alcohol and had refused to submit to a chemical test. A hearing is then held before the Department of Public Safety, and if the Department determines that the person was granted "the right to submit to a chemical test or tests" and refused to take such a test, the Department shall revoke for one year the driver's license.

On the night of December 8, 1977, the plaintiff, who had recently come from California to Utah, was driving his automobile and was pulled over to the side of the road by two police officers. The arresting officer testified that he stopped the plaintiff because of a call from the dispatcher to be on the lookout for an automobile which resembled the plaintiff's. The officer, however, also testified that he observed the plaintiff make a right-hand turn, swerve in a jerky fashion, and, instead of returning to the right-hand lane of traffic, straddle the white dividing line. After plaintiff's car was stopped, he had to hold onto the door of his car, apparently for support, and the officer detected the smell of alcohol on the plaintiff. The officer then administered field sobriety tests, and the plaintiff failed to perform the heel-to-toe test. On the basis of observing the plaintiff and his performance of the field sobriety tests, the officer arrested the plaintiff for driving under the influence of alcohol. The officer then read to the plaintiff the provisions of the Utah Implied Consent Statute. In response plaintiff stated, "I'm a criminal, yeah, yeah, yeah, I'm a criminal." On two subsequent occasions the arresting officer explained to the plaintiff that if he refused to take a test, he could lose his license for a year. On each occasion the officer express-

---

1. U.C.A. refers to Utah Code Annotated, 1953, as amended. The particular section in question appears in the 1977 supplement.

ly asked the plaintiff if he would take a test. Each time the plaintiff refused to give a yes or no answer and instead responded with the words "I don't know." Still a fourth time, at the jail, the officer asked the plaintiff to take a test, and this time the plaintiff refused to reply.[2] All this occurred within 30 or 40 minutes. Clearly, the plaintiff had ample opportunity to learn the consequences of his refusals to take a test and sufficient time to fully deliberate and even to change his mind.

Plaintiff's self-serving testimony at the hearing that he did not intend to refuse a test and his statement at the booking desk to the effect that he had not taken a test hardly militate against the message conveyed by the totality of his conduct in the presence of the police officer. At the most, they have minimal probative value.[3]

After a hearing the Department of Public Safety found that plaintiff had refused to take a test. The district court, hearing the case de novo, entered written findings of fact and conclusions of law to the effect that plaintiff's actions constituted a refusal to take the test. Since the findings of the trial court are supported by substantial, competent evidence, they must be affirmed. *Charlton v. Hackett*, 11 Utah 2d 389, 360 P.2d 176 (1961); *DeVas v. Noble*, 13 Utah 2d 133, 369 P.2d 290 (1962).

▪ Plaintiff, however, presses upon us the argument that under the law a refusal must be an express, unequivocal refusal before a driver's license may be revoked.

This interpretation of the statute would effectively emasculate it and is without foundation in authority or logic. If this argument were accepted, any person driving under the influence of alcohol could avoid having his license revoked by temporizing, equivocating, or simply remaining silent, as the facts of this case clearly illustrate. The irony of the argument is that a person inebriated to the point of unconsciousness would be saved from the loss of his license. The Legislature has, however, rejected this logic by expressly providing that a blood test may be performed on an unconscious person.[4]

The implied consent statute should be construed in a fashion to make its application practicable and to enable an officer to deal realistically with arrested drivers who may be uncooperative, and even hostile. An officer would be confronted with an extremely difficult, if not impossible, problem if the statute were construed to require an express verbal refusal and an arrested driver simply equivocated or remained silent when requested to take a test. How many times should an officer ask a driver, who refuses to give an unequivocal answer, to take the test? Should he be required to persist and continue to repeat the request until such time as the driver believes that he has achieved a degree of sobriety sufficient to pass the test and is safe in giving a straight answer? The consequence of such a construction is to place a premium on uncooperativeness and obstruction that would likely inflame an already tense situation. Certainly the Legislature did not intend that law enforcement officers be placed in such an impossible situation or that the purpose of the law should be so easily evaded.

It cannot properly be argued that an express refusal is required because consent of a driver to take a test is implied by virtue of Section 41–6–44.10(a). That section provides that a driver is "deemed to have given his consent" to a test. The implied consent, however, is nothing more than a legal fiction, (see "The Status of Implied Consent Legislation Since *Schmerber v. California*," 1967 Utah Law Review 168, at 169); it is simply a *legally* "implied consent" of the driver to take a blood test as a condition to using the highways. The fiction has been

---

**2.** The findings of fact indicate he was asked to take the test three times. These findings apparently do not include the one time at the jail.

**3.** In any event, it was incumbent on plaintiff at that time affirmatively to ask that the test be administered. Under the Utah statute it is nec-

essary that after a refusal the motorist be told that he may lose his license if he does not then request the administration of a test. Section 41–6–44.10(b).

**4.** Section 41–6–44.10(c).

indulged to avoid possible constitutional difficulties in requiring an alcohol test. In any event, there is no force to the contention that an express, verbal refusal is necessary to withdraw the consent implied by the statute. It is the reality of the situation that must govern, and a refusal in fact, regardless of the words that accompany it, can be as convincing as an express verbal refusal.

Certainly it is unrealistic to contend that the plaintiff had not withdrawn his consent because he had not expressly refused to take the test. The unavoidable fact is that the appellant in this case, under any realistic appraisal of the facts, refused by his actions to take a blood test and simply played verbal games with the officer to avoid a direct refusal.

*Hyde v. Dorius,* Utah, 549 P.2d 451 (1976), relied upon by the plaintiff for the proposition that there must be an express refusal, does not support that proposition. That proposition was stated in Justice Maughan's opinion in *Hyde,* but that opinion was concurred in only by Justice Tuckett. Chief Justice Henriod filed a separate opinion concurring in the result only. There was no indication in the opinion that he adhered to the "express refusal" concept. Justice Ellett dissented, and Justice Crockett concurred in that dissent. Thus, three justices refused to accept the "express refusal" concept. The issue in this case is not therefore controlled by the holding in *Hyde.*[5]

The overwhelming weight of authority holds that a refusal may be established on the basis of the conduct of the motorist, without an express refusal, if he has clearly been asked to take a test. *Campbell v. Superior Court,* 106 Ariz. 542, 479 P.2d 685 (1971); *Cahall v. Department of Motor Vehicles,* 16 Cal.App.3d 491, 94 Cal.Rptr. 182 (1971); *Lampman v. Department of Motor Vehicles,* 28 Cal.App.3d 922, 105 Cal.Rptr. 101 (1972); *Buda v. Fulton,* 261 Iowa 981,

157 N.W.2d 336 (1968); *Hoban v. Rice,* 25 Ohio St.2d 111, 267 N.E.2d 311 (1971); *McKenzie v. Bureau of Motor Vehicles,* 37 Ohio Misc. 24, 306 N.E.2d 197 (1973); *State Department of Motor Vehicles v. Riba,* 10 Wash.App. 857, 520 P.2d 942 (1974).

*Lampman v. Department of Motor Vehicles, supra,* is closely in point and is illustrative of the approach taken by other courts. In *Lampman* the arresting officer explained the California chemical test requirement of the implied consent law to the motorist on four separate occasions and requested her to submit to a test. Each time she remained mute. The court held that silence under those circumstances constituted a refusal under the California implied consent statute. Relying upon an earlier California case, *Cahall v. Department of Motor Vehicles, supra,* in which a refusal had been found on the basis of a motorist's statement, in response to a request to take a test, that "I'm not even going to give you an answer," the court affirmed the license revocation.

*Spradling v. Deimeke,* 528 S.W.2d 759 (Mo.1975), aptly stated the standard that should be applied in determining whether a driver has in fact refused to take a test. The court stated (528 S.W.2d at 766):

There is no mysterious meaning to the word 'refusal'. In the context of the implied consent law, it simply means that an arrestee, after having been requested to take the breathalyzer test, declines to do so of his own volition. Whether the declination is accomplished by verbally saying, 'I refuse', or by remaining silent and just not breathing or blowing into the machine, or by vocalizing some sort of qualified or conditional consent or refusal, does not make any difference. The volitional failure to do what is necessary in order that the test can be performed is a refusal.

---

**5.** It should be noted that the 1977 amendments to the Implied Consent Statute expressly state an arrested person does not have the right to consult an attorney or to have his physician present as a condition to taking the test. Section 41–6–44.10(g), U.C.A., 1953, (1977 Pocket Supplement). This amendment has the effect of overruling several prior Utah cases involving a motorist's demand that an attorney or physician be present, i. e., *Hunter v. Dorius,* 23 Utah 2d 122, 458 P.2d 877 (1969); *Gassman v. Dorius,* Utah, 543 P.2d 197 (1975); *Peterson v. Dorius,* Utah, 547 P.2d 693 (1976).

*Mills v. Swanson*, 93 Idaho 279, 460 P.2d 704 (1969), relied upon in the main opinion in *Hyde* as authority for requiring an express verbal refusal, is not in fact inconsistent with the rule above stated, since it dealt with a fact situation involving a dazed or injured driver. In *Mills* the court stated, 460 P.2d at 706:

> *We emphasize however that the question as to what constitutes a refusal to take the test must depend on the circumstances.* In the case at bar, respondent, injured and in a dazed state, failed to respond to the officer's request. Under these circumstances it cannot be said that silence constituted a refusal to submit to a chemical test for determining the alcohol content in the blood. If the officer was in doubt he could have requested the respondent to sign a written authorization and waiver for the administration of the test. [Emphasis added.]

*Mills* does not preclude an officer or a trier of fact from making a realistic appraisal of a motorist's behavior when he fails to give an unequivocal verbal answer to a request to take a test.

▮▮▮ Clearly the loss of driving privileges is a severe deprivation that may have serious consequences for an individual, not the least of which is the possible loss of employment. Accordingly, it is important that a law enforcement officer make a determination that a motorist has refused to take a test on the basis of conduct which clearly indicates a volitional refusal with an understanding of the consequences that follow upon a refusal. However, an officer "is not required to know the state of mind of the person arrested and determine whether such person understood he was refusing to submit to the test"; necessarily that judgment must be made under an objective standard, *Strand v. State Department of Motor Vehicles*, 8 Wash.App. 877, 509 P.2d 999, 1002 (1973). If there is doubt, it may be advisable for an officer to request a motorist to sign a document attesting to his refusal to take a test, or actually to present

the test implements to the motorist. However, such actions are not mandatory,[6] but rather an additional step which an officer may take in an effort to clarify the response of the motorist if there is genuine confusion caused by trauma.

In the instant case the officer read the implied consent statute verbatim to the plaintiff, and on two subsequent occasions the officer explained to the plaintiff the consequence of refusing to take a test. Applying an objective standard, *Strand v. State, supra*, to whether plaintiff understood the consequences of his actions, there can be no question that the plaintiff was adequately informed and that any reasonable person would have understood. The trial court's conclusion that the plaintiff had a "misconception" can only be founded upon the plaintiff's testimony that he relied upon his asserted understanding of California law in subjectively concluding that he would have still another opportunity, after the fourth request, to take a test. That view of California law is certainly questionable in the light of the California law above cited, but in any event the officer did all that was required of him, and the trial court's conclusions are adequately supported by the evidence and its order of revocation decided under a proper legal standard.

The judgment of the trial court is affirmed.

CROCKETT, C. J., and WILKINS and HALL, JJ., concur.

MAUGHAN, Justice (dissenting).

For the following reasons, I dissent: The entire conflict over the proper interpretation of § 41–6–44.10 could be averted by the adoption of a standard procedure whereby anyone refusing to take a chemical test would execute a form setting forth the refusal. A refusal to execute such a form could be deemed tantamount to an express refusal and could be so noted in the officer's sworn report. Thus, the ever-increasing

---

6. *Lampman v. Department of Motor Vehicles*, supra, 105 Cal.Rptr. at 104, discussed the suggestion that an officer should be required to present the test implements to a motorist in an

effort to force a clear answer. The court rejected the proposition as tending to introduce an undesirable element of force into what may be an inflammatory situation.

line of appeals concerning whether the actions of a driver constituted a refusal could be diminished, and a uniform objective standard would be established. All statutory references are to U.C.A.1953, unless otherwise indicated.

The majority opinion engages in rhetorical hyperbole to support an untenable position.[1] The majority opinion is predicated on a false premise that the implied consent law is a fiction which may now be discarded, because the feared constitutional infirmities which compelled its usage have been resolved. Thus, in construing § 41-6-44.10, the majority utilizes the rule of expediency rather than the legislative intent as expressed in the statute. The implied consent law has been convoluted into the implied refusal law whereby no defendant can be required to submit to any chemical test without his consent.[2]

A survey of the article in the 1967 Utah Law Review 168, cited by the majority, reveals the infirmity in the reasoning of the majority opinion. The article states that the "implied" consent statute was developed to circumvent the need for obtaining consent.

> . . . This consent, of course, is a fiction. Failure to submit to a test is a ground for suspension of the driving license . . .[3]

In my view, it is unfortunate the majority adopts the "shock" language of the Law Review article, which styles the implied consent a fiction. Such language is inaccurate, and serves only to deflect the mind from analysis. It is, in fact, a condition which attaches to the privilege of driving an automobile in Utah for resident and nonresident alike.

A fiction is that which is opposed to fact or reality. Certainly, the legislative enactment makes it a fact; and in reality, it is a proper exercise of police power for the protection of the public.

The implied consent statute serves its legitimate purpose as does our 41-12-8, and in the same fashion. In the latter statute, a nonresident et al., by operating a motor vehicle over the highways of this state, resulting in personal or property damage, "shall be deemed" to have appointed the Secretary of State as his attorney to accept service of process. In reality, this is also a fact, because the legislature has said it is.

The article cites *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and then continues:

> . . . In *Schmerber*, the court in the absence of implied consent legislation, upheld the taking of blood for chemical analysis from a person arrested for drunken driving, despite the driver's refusal to consent to the taking. The court held that the privilege against self-incrimination is not violated when "physical" evidence such as blood is compelled from a defendant, that there is no unreasonable search and seizure if the taking is incident to a valid arrest and is done in a medical environment, and that due process is not violated in the absence of outrageous police methods in the taking.

So long as *Schmerber* remains good law and state courts interpret state constitutional provisions as *Schmerber* interprets the federal provisions, there is no apparent need for implying consent of drivers to chemical tests. *Thus it would appear that Schmerber has negated the need for implied consent legislation in most states.* A few state courts, however, have given a more liberal interpretation to state constitutional provisions, either extending the privilege against self-incrimination and thereby prohibiting the taking of "physical" evidence, or requiring the con-

---

1. See following statement: ". . . How many times should an officer ask a driver who refuses to give an unequivocal answer, to take the test? Should he be required to persist and continue to repeat the request until such time as the driver believes that he has achieved a degree of sobriety sufficient to pass the test and is safe in giving a straight answer? . . ."

2. See the North Dakota Statute, § 39–0801 N.D.R.C.1953, Sup., and how it was contrasted with an implied consent law in *State v. Bock*, 80 Idaho 296, 328 P.2d 1065, 1072–1073 (1958).

3. 1967 U.L.R. 170.

sent of the defendant for a legal search and seizure involving body fluids. Also, it is entirely possible that the five-to-four decision in *Schmerber* may be overruled. In either situation, body fluid tests would be excluded in the absence of consent. Therefore, implied consent laws would appear to be a means of avoiding constitutional obstacles and should be enacted as the only effective way to obtain scientific evidence.[4] [Emphasis supplied.]

The need for a viable implied consent statute in Utah has not been negated by *Schmerber* because of the difference in language in Article I, Section 12, Constitution of Utah, with the Fifth Amendment of the United States Constitution. Article I, § 12, Constitution of Utah, provides:

. . . The accused shall not be compelled to give *evidence* against himself; a wife shall not be compelled to *testify* against her husband, nor a husband against his wife, . . . . [Emphasis supplied.]

The term "evidence" is obviously broader than the testimonial privilege of the Fifth Amendment; such a conclusion is compelled by the use of the term "testify" in contrast to the term "evidence" within the same sentence in § 12 of Article I. It is, therefore, imperative that § 41–6–44.10 be interpreted as written to avoid constitutional obstacles.[5]

What is the proper construction of § 41–6–44.10? Subdivision (a) provides that any person operating a motor vehicle in this state shall be deemed to have given his consent to a chemical test. Subdivision (c) provides that any person who is dead, unconscious, or in any other condition rendering him incapable of refusal to submit to a chemical test shall be deemed *not* to have *withdrawn* his consent.

Subdivision (b) provides:

If such person has been placed under arrest and has thereafter been requested by a peace officer to submit to any one or more of the chemical tests provided for in subsection (a) of this section, and refuses to submit to such chemical test or tests, such person shall be warned by a peace officer requesting the test or tests that a refusal to submit to the test or tests can result in revocation of his license to operate a motor vehicle. Following this warning, unless such person immediately requests the chemical test or tests as offered by a peace officer be administered, no test shall be given . . .

Under the mechanics established by the legislature, any motorist operating a motor vehicle in this state has given his consent to a chemical test. This consent is *not withdrawn* if the motorist is unconscious or in such a condition that he cannot communicate a refusal. There are two conditions precedent to a withdrawal of consent: first, the arrested motorist must communicate his refusal to the peace officer; second, the peace officer must reiterate the consequences of this refusal, viz., revocation of the operator's license. Without this sequence mandated by statute, consent to a chemical test is not withdrawn.

The most pertinent definition of the term "refuse" within the statutory context is "to show or express a positive unwillingness to do or comply." "Refusal" means a "rejection of something demanded, solicited, or offered for acceptance."[6]

---

4. 1967 U.L.R. 171–173.

5. Under a constitutional interpretation requiring consent for the taking of body fluids, the legislative imposition of a choice of either submitting to a chemical test or losing the driving license is constitutionally sound so long as the statutory procedures meet due process requirements: a legitimate legislative end, a reasonable means of meeting that end, and sufficient procedural safeguards. Several considerations indicate that all such requirements are met by implied consent laws. First, exclusion of drunken drivers from the highways is a legitimate end of legislation. Second, the use of the compulsory chemical test, or in the alternative the license suspension, is the only reasonable means thus far found which is accommodated to accomplish this end effectively. Third, the menace of drunk driving is such that a condition on the driving license which requires submission to a test when arrested for drunk driving is warranted—whether the license is regarded as a privilege or a right. Fourth, notice and opportunity for hearing, the procedural due process requirements when an important interest is at stake, have been provided for in the implied consent laws. 1967 U.L.R. 173.

6. Webster's Third International Dictionary.

The implied consent statute of Utah should be contrasted with Oregon's, wherein O.R.S. § 483.636 requires the motorist "expressly consents" to a blood, urine, or saliva test.[7] In Utah, until a motorist shows or expresses a positive unwillingness to take the test, his consent is not withdrawn, viz., he has not refused or revoked his prior consent. Idaho, in three cases, has attempted to define a refusal within the confines of its implied consent law. In *State v. Bock*,[8] the court compared the Idaho statute with North Dakota's, N.D.R.C. 1953 Supp. 39–0801, the latter provided "no defendant shall be required to submit to any chemical test without his consent." The court stated:

> . . . Our statute is different. By operating a motor vehicle in this state, the defendant is 'deemed to have given his consent to a chemical test.' The only way he can withdraw that consent is to expressly refuse the test. So under our law, if he neither refuses nor consents, expressly, the test may be made.

In *Mills v. Swanson*,[9] the issue was whether, under the facts of the case, the silence of the motorist in response to a request to submit to a chemical test constituted, as a matter of law, a withdrawal of the statutorily granted consent to such a test. The court observed that the motorist did not at any time expressly refuse to take the test. The court stated:

> . . . Expressly means in direct or unmistakable terms. [Citations] Expressly means declared and not merely left to implication. [Citations] Thus where an individual has neither refused nor consented, but for some reason within the discretion of the officer, the test is not administered, it cannot be said that there was an express refusal to take the test.

Finally, in *Mills v. Bridges*,[10] the court clarified its meaning:

. . . Although this court held in *Mills v. Swanson* [Citation] that the refusal must be express in the sense that it cannot be left to the inference whether defendant has consented or refused, here there is no doubt but that appellant was refusing to take the breath test. The issue is whether the qualification or condition that she first consult with her attorney justified the refusal. It is our conclusion that it did not.

In my view, the majority misinterprets *Mills v. Swanson* (Footnote 9). There, as in others, the Idaho court is wisely developing an objective standard by which the conduct of the State and the defendant can be measured. On the contrary, I believe the majority provides no guidance in this area, but adopts the formlessness of total subjectivity.

Indeed, to claim support from *Mills v. Swanson*, the majority has the Idaho court saying one thing 460 P.2d on p. 705, and another 460 P.2d on p. 706. Finding support for one's point is not difficult if we wish to read out of context.

The majority manufacture a straw man in saying, ". . . there is no force to the contention that an express, verbal refusal is necessary to withdraw the consent implied by the statute." The only place I find such a contention is in the majority opinion.

Other courts have articulated a standard to determine whether there has been a refusal to submit to a chemical test—the trier of fact should consider the driver's words and other external manifestations of willingness or unwillingness to take the test. Physical resistance is deemed as overt a manifestation of refusal as a verbally expressed "no."[11]

Under the facts of this case, may Beck's silence be held as a matter of law to constitute an external manifestation of unwill-

---

7. See *State v. Stover*, 271 Or. 132, 531 P.2d 258 (1975).

8. 80 Idaho 296, 328 P.2d 1065, 1072–1073 (1958).

9. 93 Idaho 279, 460 P.2d 704, 705 (1969).

10. 93 Idaho 679, 471 P.2d 66, 68 (1970).

11. *Dolan v. Rust*, Sup.Ct.Colo., 576 P.2d 560, 562 (1978); *Roswell v. City & County of Honolulu*, Sup.Ct.Haw., 579 P.2d 663, 671 (1978); *Campbell v. Superior Court*, 106 Ariz. 452, 479 P.2d 685, 696 (1971).

ingness to take a chemical test, an express refusal?

The majority opinion relates that initially the arresting officer read Beck the law, and then "on two subsequent occasions" explained to Beck the consequences of a refusal to take the test. Finally, at the jail, the officer again asked Beck to take the test. The majority opinion states that these events occurred over a period of 30 or 40 minutes. The majority opinion concludes:

> . . . Clearly, the plaintiff had ample opportunity to learn the consequences of his refusals to take a test and sufficient time to fully deliberate and even to change his mind. .

According to the record, the first three occasions were not, in fact, separate and distinct events, but were rather a part and parcel of one-time continuum.

The arresting officer, Randall Mark, testified:

> A. Immediately after I placed him in the rear of my patrol car—there is a cage installed between the back seat and the front seat, part screen and part glass.
>
> I turned to my side and opened my briefcase, and there's a little orange card I keep in there that has the implied consent law on it.
>
> I stated to Mr. Beck, as I do anyone else, 'Listen very carefully. I have something that I'm required to read to you.'
>
> I read it verbatim off the card, and I said, 'Do you understand?'
>
> And Mr. Beck says, 'I'm a criminal; yeah, yeah, yeah, I'm a criminal.'
>
> I said, 'Let me explain it to you again in my own words. If you do not take the Breathalyzer test you will lose your license for a year. Do you want to take the test?'
>
> He said, 'I don't know.' And I asked him again, and he never said anything.

During this time, Beck was described as hostile, agitated, angry, and upset. It should be reiterated that Beck was pulled over because his vehicle matched the description of one given by the dispatcher. The officer was asked if the driving pattern were not the sole reason the officer stopped the vehicle. The officer responded "No, Sir; it was not the reason at all." The officer arrested Beck after observing his demeanor and administering a field sobriety test. One factor observed by the officer was Beck's slurred speech. It is interesting to note the officer later learned this was Beck's usual speech pattern.

When Beck and the officer arrived at the jail, the officer asked Beck one more time to take the test. The officer interpreted Beck's remaining mute as a refusal and immediately executed the refusal form and departed.

The police officer testified plaintiff never expressly refused to take the Breathalyzer test.

Counsel for the state queried the officer:

> Was there anything about his physical demeanor that would lead you to believe that he had refused?

The arresting officer responded:

> Other than remaining mute; no.

The officer testified he was at the jail only five to seven minutes—the time required to fill out the form. Significantly, the officer testified he did not explain to Beck the consequences of his refusal when they arrived at the jail, and the last request to take the test was made. If Beck's silence were deemed the basis of the refusal, the officer was required under the mandate of subsection (b) to inform Beck of the consequences.

The state argued before the trial court that under the circumstances, there was an implied refusal. The trial court found the actions of Beck amounted to a refusal. With this conclusion, I cannot agree. Beck's actions indicated neither a willingness nor unwillingness to take the test; so the statutory consent had not been withdrawn. If the officer had informed Beck of his interpretation of Beck's silence and that he was executing a refusal form, the ambiguity of Beck's silence could have been resolved. Under the facts of this case, Beck's refusal can only be inferred, derived by implication, which is contrary to the statute. Beck did not show or express a positive unwillingness to take the test; his actions did not demonstrate a rejection of the offered test. Under our implied consent

law, a refusal must be express in the sense there must be an external manifestation of unwillingness to take the test; a refusal cannot be based on inference. Otherwise, the legislative policy circumscribing withdrawal of consent to the narrowest grounds would be undermined by a dubious judicial construction. Section 41–6–44.10 is an implied consent law, not an implied refusal law.