**Carl H. POWELL, Plaintiff and Appellant,**

v.

**S. Tony COX, Director, Drivers License Division, Department of Public Safety for the State of Utah, Defendant and Respondent.**

**No. 16660.**

Supreme Court of Utah.

March 3, 1980.

Robert M. McRae of McRae & DeLand, Vernal, for plaintiff and appellant.

Robert B. Hansen, Atty. Gen., Bruce M. Hale, Asst. Atty. Gen., Salt Lake City, for defendant and respondent.

HALL, Justice:

Defendant appeals the revocation of his driving privilege for refusing to submit to a chemical test.

Defendant was arrested by a Vernal City police officer on March 13, 1979, for the offense of driving under the influence of alcohol. Subsequently, he was taken to the Uintah County jail and instructed that he must take a breathalyzer test or lose his driver's license for one year.[1] Defendant initially refused outright to take the test, but after conversing by telephone with his attorney, defendant agreed to submit to the testing procedure. However, he refused to follow precisely the officer's instructions in giving a breath sample. The following testimony of Officer Parker (the arresting officer) gives rise to this appeal:

> A. Officer Curtis instructed Mr. Powell that what he had to do, he brought the hose out, showed up the mouthpiece, said what he needed to do was give him a deep lung air sample.
>
> Q. Are those exact words?
>
> A. To the best of my knowledge, yes. He said that frequently the word, "deep air sample, deep lung air sample."
>
> Q. Did he demonstrate where that air was to come from?
>
> A. I could not recall. During the test he placed his hands on his back in an effort to kind of indicate that he had to squeeze out some air. But I cannot recall any other gesture.
>
> Q. Okay. Did you see Mr. Powell blow into the machine?
>
> A. I saw him look like he was going to blow into the machine.

---

1. Pursuant to U.C.A., 1953, 41-6-44.

Q. What did he do? Describe his physical action.

A. He placed the mouthpiece in his mouth and kind-a made a move like he was blowing, like that. (Indicating) But het [yet] I heard no air going through the hose.

Q. Did he purse his lips?

A. Yes, somewhat. I assume you mean by that kind of blow them out like there was air in there.

Q. Okay. The first time that he made that agreement did the green light go on?

A. No, it did not.

Q. Did Officer Curtis give any explanation about that light or what it meant or did not mean?

A. No, he did not. He just says basically he wanted him to blow the green light out, which is just a little inspiration. And then we wanted him just to blow in there as far as he can, and we indicated that to him.

Q. Did he explain to him how hard he needed to blow in order to give him the deep air sample that he requested?

A. More or less. He kept saying, "We've got to have a deep air sample. We've got to blow hard into it. Take your tongue off it. Just blow free into the machine. Blow down until it feels deep."

Q. Did he ever do that?

A. No, he did not.

Q. Okay. After the first time, you described him blowing the first time, did he attempt a second time?

A. Yes, he did. To my memory, it was several times. Officer Mel Curtis and the rest of us kept urging him to blow in the machine, telling him to take his tongue off it. And he kept making with this action. Finally I did hear a small amount of air go in there, and the green light did come in.

THE COURT: This green light did come on?

THE WITNESS: Yes, it did.

Q. (By Mr. Hale) Okay. After the light went on, did Officer Curtis administering the test ask for another breath sample with more air?

A. Yes, he did.

Q. What did he say to Mr. Powell?

A. Said, "You haven't given us a deep lung sample. You made the light go on, but we need more than. Keep blowing harder." Some words to that effect.

Q. What did Mr. Powell say to that?

A. He stalled around there for several minutes. Kept telling him that that would be a refusal if he did not give us a deep lung sample.

Q. Did he subsequently blow into it again as he was requested?

A. No, he did not. He kept saying, "The green light was on. That's all I have to do."

Q. Okay. Who was holding the end of the hose?

A. He was.

Q. After the several minutes had ensued and these conversations that you talked about, then what happened?

A. I cannot recall exactly how he indicated that was enough. I recall him fling or doing something with the end of the hose and sitting down saying, "No, I will not take the test." I cannot recall his exact words, however.

On cross examination Officer Parker testified:

Q. You are familiar that as soon as the cylinder has acquired 55 c.c's of breath that a green light will go on?

A. Yes, sir.

Q. You are familiar with the fact that when the requisite 55 c.c's, which is the maximum this cylinder holds, that a magnetic, electro-magnetic action takes place within the machine to activate the green light? Right?

A. Some sort of reaction, yes.

Q. So apparently what happened is that Mr. Powell gave you 55 c.c's of breath, right?

A. Yes, sir.

Q. And Mel Curtis never—I trust he was using the standard operational checklist?

A. Yes, he was.

Q. An eight-step checklist?

A. I believe it's eight, yes.

Q. And the eight-step is: "turn to analyze"?

A. Yes.

Q. And Officer Curtis never turned to analyze the 55 c.c's that was provided?

A. No, he did not.

The single issue raised therefore relates to the discretion an officer has in administering a chemical test. Specifically, the question is, can an officer reasonably require a defendant to do more than merely activate the green light of a breathalyzer, which indicates that he has furnished a given volume of air? We believe an officer can require an arrested person to furnish what the officer reasonably believes to be a viable sample, and that the "green light" is merely an aid to him in making that determination.

Such a ruling is consistent with the general thrust of the statute [2] which invests the officer with broad and discretionary powers to administer "chemical tests" for alcohol abuse. The reason for permitting an officer to take an additional sample is because the result of the test is dependent not upon the volume of the sample, but the quality. This is explained as follows:

A fresh mouth piece, or saliva trap, is then attached to the heated Sample Tube and the subject is instructed on how the sample is to be delivered. The subject should be told to blow as long as possible in order to be sure that the sample is from the deep lung area of the subject and thus an Alveolar air sample. Regardless of the amount of air blown into the machine, the vent system disposes of all but the last section of the predetermined sample chamber volume of 52.5 cc. If the subject does not, or cannot, produce a deep lung Alveolar air sample, and in reality only passes mouth air into the machine, then a false reading will be obtained. This reading may be falsely high or low depending upon the contents of residual hydrocarbon material present in the mouth of the subject at the time of the test.[3]

It is therefore in the best interest of the state *as well as an arrested person* to obtain a deep lung sample. As long as the officer administering the test is not unreasonable in his request he has considerable discretion in obtaining a satisfactory sample.[4] We have previously ruled that "[t]he Implied Consent Statute should be construed in a fashion to make its application practicable and to enable an officer to deal realistically with arrested drivers who may be uncooperative . . .."[5] Furthermore, "[e]ach case is based on its own facts, and we do not reverse the trial judge unless he clearly does violence to the facts as they relate to his findings."[6] The trial court found that defendant unreasonably refused to submit to a reasonable request by the officer for a more complete sample.

Because the defendant was found to have refused to submit to the test, his driving privileges were properly revoked. The decision of the trial court is hereby affirmed. No costs awarded.

CROCKETT, C. J., and MAUGHAN, WILKINS and STEWART, JJ., concur.

---

2. U.C.A., 1953, 41–6–44.10(b).

3. Richard E. Erwin, *Defense of Drunk Driving Cases*, Third Edition, Vol. 2 (1979), § 22.02, p. 22–15.

4. This is not to suggest that an officer could obtain a second sample after an analysis had been done on the first sample merely because the officer was dissatisfied with the results.

5. *Beck v. Cox*, Utah, 597 P.2d 1335, 1337 (1979). See also *Moran v. Shaw*, Utah, 580 P.2d 241 (1978).

6. *Gassman v. Dorius*, Utah, 543 P.2d 197, 198 (1975).