Edward W. NOVOTNY, Respondent,

v.

ST. PAUL UNITED METHODIST CHURCH and Church Mutual Insurance Company, Relators.

No. C6–83–230.

Supreme Court of Minnesota.

Sept. 23, 1983.

---

Gary M. Hagstrom and Robert V. Daly, Jr., Minneapolis, for relators.

Kenneth E. McCoy, St. Paul, for respondent.

KELLEY, Justice.

Review on certiorari of a decision of the Workers' Compensation Court of Appeals awarding Edward Novotny compensation for permanent and total disability and for certain permanent partial disabilities and awarding his wife, Fern Novotny, the reasonable value of nursing services, determined to be $280 a week subject to annual adjustment by a percentage equal to the percentage applicable to compensation payable to employee for total disability under Minn.Stat. § 176.645 (1982). Relators, St. Paul United Methodist Church and its compensation insurer, contend that both awards were excessive. We affirm in part, reverse in part, and remand for further proceedings.

1. The claim that the award for nursing services is excessive essentially raises a factual issue. Minn.Stat. § 176.135, subd. 1 (1982) requires an employer to pay for "the reasonable value of nursing services by a member of the employee's family in cases of permanent total disability." In *Alexander v. Kenneth R. LaLonde Enterprises,* 288 N.W.2d 18, 21 (Minn.1980) we recognized that a determination of what are "nursing services" and what is the "reasonable value" of such services is a question of fact to be determined by the informed practical judgment of the Court of Appeals.

In *Alexander* we upheld a finding that the reasonable value of nursing services rendered by the employee's wife was $3.75 an hour for an 8-hour day, a finding based on her testimony about the tasks she performed and on evidence that $3.75 an hour was the beginning wage, exclusive of substantial "fringe benefits," of a licensed practical nurse in local area hospitals. We discussed the similarities and dissimilarities between the services performed by Mrs. Alexander and those performed by a licensed practical nurse and concluded that the Court of Appeals' use of that wage was reasonable.

In this case also, detailed evidence was presented concerning the tasks employee's wife performs. On July 28, 1979, employee sustained a fractured vertebra when he fell from a ladder while trimming trees for the church. This serious back injury resulted in complete paralysis of both of employee's legs and loss of control of his bladder and bowel. He continues to have considerable physical pain and discomfort in his chest, back and stomach. Mrs. Novotny sets out his clothing for him every morning, helps him get into a shower once a week and otherwise helps him with daily sponge baths, aids him with dressing, and exercises his legs every night. She helps, or stands

by ready to help, when employee transfers himself from his bed to his wheelchair and from his wheelchair to other chairs. He wears a catheter which must be changed every 5 hours during the day and this usually requires her assistance. She also empties a waste bag worn on his leg for him and assists him with bowel evacuation, requiring manual extraction, every other day and sometimes oftener. Because of accidents she must change his bed and clothing and has extra laundry 3 or 4 times a week. Employee is fearful of driving because he often has spasms in his chest and stomach, so his wife transports him to medical appointments and elsewhere, setting up and removing a portable ramp in the garage each time. Based on their testimony concerning these services and a time record which she had kept, the compensation judge made a finding, affirmed by the Court of Appeals and unchallenged by relators, that Mrs. Novotny spends an average of 6 hours a day caring for employee.

Considerable evidence was presented on what the cost of Mrs. Novotny's services would be if they were furnished by professionals. Kathy Wilde, a registered nurse and former director of a health care agency providing homemakers and home health aides to invalids, testified for employee that if his wife were not present to care for him through a 10 to 12-hour period each day, a live-in home health aide, for which the agency charges $76 a day, would be the most economical way to furnish employee necessary care.[1] Ms. Wilde also felt that a homemaker, for which the agency charges $7 an hour, would be necessary to assist with laundry and house cleaning 8 hours a week. The agency pays live-in home health aides $40 to $50 a day and homemakers $5 to $5.50 an hour.

Debra Tessier, also a registered nurse, who testified for relators on this issue, felt that a live-in home health aide was not necessary as long as Mrs. Novotny was in the apartment. Assuming that Mrs. Novot-

ny did only what she had been doing before the injury, Ms. Tessier said that a home health aide would be necessary for a maximum of 3 hours a day, part in the morning and part in the evening, and a homemaker would be appropriate for 3 hours once a week. She had been informed by two agencies that charges for home health aides ranged from $2.25 to $15 an hour and for homemakers from $2.25 to $11.20 an hour, depending on the patient's income. Another agency had quoted a $6 to $7 charge an hour for home health aide care. Ms. Tessier did not know whether these rates were what the worker actually received or included a charge made by the vendor of the services.

Finally, Paulette Lappi, another registered nurse and the director of a nursing service providing home care, testified that her agency charges $8 an hour for a home health aide, the aide receiving $5.50 to $6 an hour, with a 2-hour minimum charge, and that her agency charges $6.70 an hour for a homemaker, the homemaker receiving $4.50 to $5 an hour. Ms. Lappi said that nursing home charges for skilled nursing care would be $54 a day and for intermittent nursing care, available to patients who can dress and transfer themselves, would be $47 per day.

The finding that the reasonable value of Mrs. Novotny's nursing services was $280 a week is obviously within the range of charges to which these witnesses testified and thus has substantial evidentiary support. Relators' attempt to avoid affirmance of the finding by the claim that the Court of Appeals improperly used "replacement cost" is without merit since the work to be performed by a home health aide would be exactly what employee's wife is doing. Recourse to information concerning what others would charge for such services was thus appropriate and necessary to give the fact finder an informed practical judgment on the issue of their reasonable value. *See Alexander,* 288 N.W.2d 18.

---

1. Because home health aides on an hourly basis could be obtained only for periods of at least 4 hours at a rate of $8.75 during the week and $9.15 on weekends, they would be more expensive than live-in aides.

2. The more troublesome issue raised by relators is whether the Court of Appeals erred in adopting the compensation judge's finding concerning employee's weekly wage. After finding that on the date of his injury employee was working part time as a custodian for the church for an average of 10 hours a week at a wage of $68.70 per month ($15.85 per week) and was also working part time as a janitor for Associated Bureaus, Inc., 30 to 35 hours a week at a wage of $525 per month ($121.15 per week), the compensation judge determined that—

> for the calculation of permanent total disability and permanent partial disability the Employee's weekly wage shall be deemed to be (40/10 × $15.85) + $121.75 or $184.55 per week.

Based on this finding, the compensation benefits awarded employee were calculated on a weekly base of $123.03 (two thirds of $184.55).

Employee urges that this finding complies with Minn.Stat. § 176.011, subds. 3 and 18 (1982), defining daily and weekly wage, and that the legislature did not intend that a seriously injured part-time employee's compensation should be limited by his actual weekly earnings. Relators argue that the finding adopted by the Court of Appeals in effect requires that employee's compensation be calculated on a 75-hour work week, a result they insist could not have been intended by the legislature. They propose instead that employee's daily wage was $27.40 ($15.85 divided by 5 plus $121.15 divided by 5) and his actual weekly wage was $137, the sum of $15.85 and $121.15, his weekly earnings at both part-time jobs.

We are compelled to agree with relators that the legislative intent could not have been that an employee who worked 40 to 45 hours a week receive compensation based on a 75-hour work week. At the same time the pertinent statutes express the legislative intent that both of employee's regular employments enter into the calculation of his daily and weekly wage.

Calculation of employee's compensation for his permanent total disability begins with Minn.Stat. § 176.101, subd. 4 (1982), which provides that such compensation—

> shall be 66⅔ percent of the daily wage at the time of the injury, subject to a maximum weekly compensation equal to the maximum weekly compensation for a temporary total disability and a minimum weekly compensation equal to the minimum weekly compensation for a temporary total disability.

Minn.Stat. § 176.101, subd. 1(1) (1982) provides that the maximum weekly compensation for temporary total disability is the statewide average weekly wage (defined in section 176.011, subd. 20) for the period ending December 31 of the year preceding the time of injury; section 176.101, subd. 1(2) provides that the minimum weekly compensation for temporary total disability shall be "not less than 50 percent of the statewide average weekly wage or the injured employee's actual weekly wage, whichever is less," and in any case at least 20 percent of the statewide average weekly wage.

Minn.Stat. § 176.101, subd. 3 (1982) provides that permanent partial disability benefits are "66⅔ percent of the daily wage at the time of injury" for the number of weeks provided in the statutory schedule, "subject to a maximum compensation equal to the statewide weekly wage." [2]

Minn.Stat. § 176.011, subds. 3 and 18 (1982) furnishes the methods for determining an employee's daily wage and weekly wage. Subdivision 3 provides:

> "Daily wage" means the daily wage of the employee in the employment in which he was engaged at the time of injury * *. If the amount of the daily wage received or to be received by the employee in the employment in which he was engaged at the time of injury was irregular or difficult to determine, or if the employment

---

**2.** Presumably the statewide average weekly wage, as defined in Minn.Stat. § 176.011, subd. 20 (1982).

was part time, the daily wage shall be computed by dividing the total amount the employee actually earned in such employment in the last 26 weeks, by the total number of days in which the employee actually performed any of the duties of such employment * * *. If, at the time of injury, the employee was regularly employed by two or more employers, the employee's earnings in all such employments shall be included in the computation of daily wage.

■ In spite of the fact that employee was injured in the course of regular part time employment, no effort was made to determine his daily wage, as directed in this provision, by "dividing the total amount [he] actually earned in such employment in the last 26 weeks, by the total number of days in which [he] actually performed any of the duties of such employment." Nor did the challenged finding comply with the last sentence of this provision, which requires that an employee's earnings in all regular employments "shall be included in the *computation of daily wage,*" a directive calling for application of the same 26-week formula to employee's earnings from his other regular part time employment with Associated Bureaus to arrive at his statutory daily wage. (Emphasis added).[3]

The importance of correct computation of daily wage is apparent from Minn.Stat. § 176.011, subd. 18 (1982), which provides for calculation of weekly wage by "multiplying the *daily wage* by the number of days and fractional days normally worked in the business of the employer for the employment involved." (Emphasis added). This statute further provides:

> If the employee normally works less than five days per week or works an irregular number of days per week, the number of days normally worked shall be computed by dividing the total number of days in which the employee actually performed

any of the duties of his employment in the last 26 weeks by the number of weeks in which the employee actually performed such duties * * *. If, at the time of the injury, the employee was regularly employed by two or more employers, the employee's days of work for all such employments shall be included in the computation of weekly wage.

It is clear that the finding directing that employee's weekly wage "shall be deemed to be (40/10 × $15.85) + $121.75 or $184.55 per week" ignored the requirements both of section 176.101, subd. 3 and of section 176.011, subd. 18. We therefore reverse the finding and the compensation award based thereon and remand with directions to allow the parties to present the necessary evidence to permit application of section 176.011, subds. 3 and 18, to determine employee's daily and weekly wage and the compensation to which he is entitled.[4]

■ Finally, we note that the compensation judge computed employee's weekly wage from his employment with the church based on a 40-hour week in apparent reliance on the last sentence of Minn.Stat. § 176.011, subd. 18 (1982), which declares that the maximum weekly compensation payable to an employee (or to his dependents in case of death) shall not exceed 66⅔ percent of the product of the daily wage times the number of days normally worked, but with the added proviso that—

> the compensation payable for permanent partial disability under section 176.101, subdivision 3, and for permanent total disability under section 176.101, subdivision 4, or death under section 176.111, *shall not be computed on less than the number of hours normally worked in the employment or industry in which the injury was sustained,* subject also to such maximums as are specifically otherwise provided. (Emphasis added).

**3.** It is not clear whether this directive was construed by the Court of Appeals to require inclusion of employee's weekly earnings of $121.15 in his weekly wage, but the provision clearly relates only to computation of daily wage.

**4.** Such evidence includes the total amount employee earned in each employment in the last 26 weeks, the number of weeks he worked in each employment in that period, and the number of days he worked in each employment in that period.

However, when section 176.011, subds. 3 and 18 are read together, they lead to the conclusion that this proviso was intended to apply only to a part-time worker whose work hours *in toto* are "less than the number of hours normally worked in the employment or industry in which the injury was sustained" in order to ensure that he receives compensation benefits equivalent to those an injured full-time worker in that employment or industry would receive. In employee's case, if he had not worked elsewhere or if his total work hours had been less than 40 hours a week, the proviso would be operative. Since he did in fact work 40 to 45 hours a week, it has no application.

Employee is awarded attorney fees of $400.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

COYNE, J., took no part in the consideration or decision of this case.