**2023 UT App 125**

# THE UTAH COURT OF APPEALS

CHRISTOPHER LAKER,
Appellant,
*v.*
CHRISTOPHER CARAS, DIRECTOR OF THE DRIVER LICENSE DIVISION,
DEPARTMENT OF PUBLIC SAFETY,
Appellee.

Opinion
No. 20220557-CA
Filed October 19, 2023

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 220901408

Jason A. Schatz, Attorney for Appellant

Sean D. Reyes and Andrew Dymek,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN D. TENNEY
concurred.

HARRIS, Judge:

¶1      Christopher Laker was arrested on suspicion of drunk driving. Later, after an administrative hearing, the Driver License Division determined that Laker had refused the arresting officer's request that he submit to a chemical test to determine his blood alcohol level, and therefore revoked his driver license for a period of 18 months. The district court reached that same conclusion after a trial de novo. Laker now appeals, challenging the court's finding that he refused a chemical test. We conclude, however, that the court's finding was supported by substantial evidence, and therefore affirm.

BACKGROUND

¶2     One night in November 2021, a Salt Lake City police officer (Officer) was called to the scene of an automobile accident.[1] Laker was identified as the driver of the vehicle. Upon his arrival at the scene, Officer noted the odor of alcohol coming from Laker and observed that Laker had slurred speech and bloodshot eyes and was unsteady on his feet. Laker admitted to Officer that he had been drinking. After Laker exhibited what Officer believed to be an inordinate number of clues during field sobriety testing, Officer arrested Laker and transported him via patrol car to the police station.

¶3     After arriving at the station, but while Laker was still inside the patrol car, Officer asked Laker to submit to a chemical test to determine his blood alcohol level. Officer made this request using a prepared form, and he read the request "verbatim off the form." Specifically, Officer informed Laker that he was under arrest on suspicion of drunk driving, and Officer asked Laker to "submit to a chemical test to determine the alcohol and/or drug content of [his] body"; Officer also warned Laker that a positive test result could "result in denial, suspension, revocation, or disqualification of [his] driving privilege." Laker refused Officer's initial request.

¶4     Following protocol, Officer then began to read Laker a second warning, again using a prepared form that law enforcement personnel use in situations in which an arrestee initially refuses a request to submit to a chemical test; this warning is known as the "refusal admonition." Before reading the admonition, Officer informed Laker that once the admonition had been read, it would be Laker's decision "to submit or not submit to the chemical test," and he would ask Laker for his "response, if

_____

1. It is unclear from the record what type of accident Laker was involved in, whether another vehicle was involved, or who reported the accident to the police.

any," but he thereafter would not "continue" to ask Laker what his position was. Officer then read Laker the following admonition, again doing so "verbatim" from the form:

> If you refuse the test or fail to follow my instructions, I must warn you that your driving privilege may be revoked for 18 months if age 21 or older, or for 2 years, or until age 21 if you are under the age of 21; or 36 months, or until age 21 if it is a second or subsequent license withdrawal for an alcohol or drug related driving offense, with no provision for limited driving. You may be subject to criminal prosecution. In addition, you will be prohibited from driving with any measurable or detectable amount of alcohol in your body for a period of five or ten years, depending on your prior driving history, and you will be prohibited from driving a vehicle without an ignition interlock device installed for a period of three years. I will make the test results available to you, if you take the test.

¶5      After receiving the refusal admonition, Laker did not immediately agree to submit to a test. Instead, he responded by expressing confusion and concern about the test, and by requesting to call his mother.[2] In response, Officer commented to

---

2. Much of Officer's interaction with Laker on the evening in question was captured on Officer's body camera, and a recording of the relevant video was played for the district court during the trial de novo. However, that video is not contained in the appellate record presented to us. Our understanding of the contents of the video, then, comes from the descriptions of it offered by Officer and by the district court itself. As regards Laker's apparent "confusion" following the admonition, the court

(continued…)

Laker, while still in the patrol car outside the station, that the decision about whether "to submit or not to submit" was "completely up to him," but that this decision needed to be made "within a reasonable amount of time." Officer then explained that he was going to "take [Laker's] seatbelt off" and take him into the station and "lock [him] into" an "Intox room," events that would give Laker a few minutes to consider his decision.

¶6      Once inside the Intox room, Officer "secured [Laker] to the bench" and then stood "in front of" Laker "for probably two minutes, waiting for" Laker to offer a "yes or a no" to the test request. Laker offered no response. At that point, Officer informed Laker he was "going to be in the other room" but would still be able to see and hear Laker, so if Laker "need[ed] anything or if [he] ha[d] any further questions" to let Officer know. Without making any further statements to Laker, Officer marked Laker as a "refusal" and began drafting a search warrant for a blood draw. While Officer was away, Laker was "on his phone."

¶7      By the time Officer returned, he had obtained a warrant to have Laker's blood drawn for testing and informed Laker that they just needed to wait for the phlebotomist who would be performing the blood draw. Altogether, the intake process lasted between two and two and a half hours, during which time Laker never once stated that he would agree to submit to a chemical test.

¶8      Some weeks later, Laker was notified that the Driver License Division (the Division) intended to revoke his license for 18 months because "a peace officer had reasonable grounds to believe that [Laker] refused to submit to a chemical test after being requested and warned by a peace officer." Following an

remarked, after viewing the video, that it "couldn't quite hear from the audio [Laker's] explanation of what it is that he wasn't understanding." We therefore do not know what Laker was confused about.

administrative hearing, the Division determined that Laker "did not submit to the [chemical] test" and therefore revoked Laker's driving privileges for 18 months.

¶9      Laker then sought judicial review of the Division's determination. The district court held a trial de novo to consider the matter; at that trial, Officer was the only witness to testify. At the end of the trial, the court took the matter under advisement.

¶10      Later that day, the court issued a written ruling denying Laker's petition for relief. The court found that Laker had indeed refused to submit to a chemical test upon request, noting that "the law require[s] an immediate request to have the test," which immediate consent Laker had not given, and stating that it could "not find" that Officer's "waiting for several minutes before finding a refusal occurred was unreasonable." Accordingly, the court declined to disturb the Division's 18-month revocation of Laker's driver license.

### ISSUE AND STANDARD OF REVIEW

¶11      Laker now appeals, and challenges the court's finding that Laker "refused" to submit to a chemical test. "Our review of a trial de novo on a driver license suspension is deferential to the [district] court's view of the evidence unless the [district] court has misapplied principles of law or its findings are clearly against the weight of the evidence." *Decker v. Rolfe*, 2008 UT App 70, ¶ 9, 180 P.3d 778 (quotation simplified). In particular, "[t]he determination that [an arrestee's] failure to respond to the officer or to take the test amounts to a refusal is a factual finding which we will not disturb when supported by substantial evidence." *Lee v. Schwendiman*, 722 P.2d 766, 767 (Utah 1986) (per curiam).

ANALYSIS

¶12    Under governing Utah law, "every person who chooses to drive a vehicle on Utah's roadways is deemed to have given implied consent, for driver license purposes, to a chemical test of their 'breath, blood, urine, or oral fluids' for the purpose of determining their impairment level." *Gukeisen v. Department of Public Safety*, 2020 UT App 32, ¶ 8, 461 P.3d 1146 (quotation simplified) (quoting Utah Code § 41-6a-520(1)(a)); *see also Beck v. Cox*, 597 P.2d 1335, 1337 (Utah 1979) (observing that Utah statutory law "provides that a driver is deemed to have given his consent" to a chemical "test as a condition to using the highways" (quotation simplified)). The implied consent statute requires any officer who, after an arrest, asks a motorist to submit to a chemical test to "warn [the motorist] that refusal to submit to the test . . . may result in . . . revocation of the [motorist's] license to operate a motor vehicle." Utah Code § 41-6a-520(2)(a).

¶13    Our law is clear that, once this warning has been given, a driver must "immediately request" that the officer administer the test. *See id.* § 41-6a-520(2)(b)(i); *see also Lee v. Schwendiman*, 722 P.2d 766, 767 (Utah 1986) (per curiam) ("[A] driver must affirmatively agree to submit to a test *immediately* following clear warning of the consequences of refusal." (emphasis added)). A driver who, after receiving the warning, does not immediately consent to a chemical test will be deemed to have "refused" the test. *See Lee*, 722 P.2d at 767 (stating that "refusal is presumed" in the absence of immediate consent); *Conrad v. Schwendiman*, 680 P.2d 736, 738 (Utah 1984) (stating that "refusal is conclusively presumed" absent immediate consent).

¶14    Moreover, the immediate consent must be clear and unequivocal. Indeed, "a motorist can 'refuse' a chemical test in any number of ways, and . . . may be considered to have refused the test even without actually saying 'no' or 'I refuse.'" *Gukeisen*, 2020 UT App 32, ¶ 9. A motorist cannot dodge a request for a

chemical test "by temporizing, equivocating, or simply remaining silent," or even by asking for an attorney. *Id.* ¶¶ 8–9 (quotation simplified); *see also Holman v. Cox*, 598 P.2d 1331, 1333 (Utah 1979) (stating that the "whole statutory scheme" of the implied consent law "could be subverted by one who equivocates or remains silent, and later protests that it was his unexpressed intent to take the test"). Our law requires motorists asked to submit to a chemical test to provide the requesting officer with an immediate, direct answer; officers in this situation are not "required to persist and continue to repeat the request until such time as the driver believes that he has achieved a degree of sobriety sufficient to pass the test." *See Beck*, 597 P.2d at 1337.

¶15     In this case, Laker does not contest that Officer had grounds to request a chemical test. Rather, he challenges the district court's finding that Laker's actions constituted a refusal to submit to a test. Laker's argument rests almost entirely on Officer's statement that Laker would be afforded a "reasonable time" to decide whether to submit to a test. Laker also asserts that Officer was obligated to inform him that a "refusal" included anything other than immediate consent. The district court rejected Laker's position, and so do we, for the following reasons.

¶16     First, Laker had already "refused" the chemical test before Officer said anything about a "reasonable time." A motorist who does not immediately request a test after being provided the refusal admonition has refused the test. *See* Utah Code § 41-6a-520(2)(b)(i); *see also Lee*, 722 P.2d at 767. And here it is undisputed that Laker did not immediately request a test after receiving the refusal admonition. Instead, he expressed confusion and asked to contact his mother. At that point, Officer hadn't yet said anything to Laker about any entitlement to a "reasonable time," and therefore that comment cannot serve to erase or nullify Laker's failure to provide immediate consent to a chemical test following the admonition. We therefore agree with the State that Laker "was conclusively presumed to have refused the test before [Officer]

made the 'reasonable time' statement." On that basis alone, Laker's petition is infirm.

¶17    But even assuming, for purposes of the discussion, that Officer's "reasonable time" statement[3] did somehow operate to give Laker a reasonable time to make his decision, the district court's finding—that Laker actually had a reasonable time to make a decision and still did not offer his consent—is supported by substantial evidence.

¶18    Officer made the "reasonable time" statement while Laker was still in the patrol car, parked outside the police station. After the statement, Officer unbuckled Laker, escorted him inside the station to the Intox room, and secured him to a bench there. It is unclear from the record submitted to us exactly how long this process took, but it was undoubtedly a few minutes. Then, after Officer finished securing Laker to a bench in the Intox room, he stood "in front of" Laker "for probably two minutes, waiting for" Laker to offer a "yes or a no" to the test request. Still, Laker offered no response. At that point, Officer informed Laker he was "going to be in the other room" but would still be able to see and hear Laker; thus, any request for a chemical test made during this period of time would have been visible and audible to Officer. But Laker did not make any request for a test during the time Officer was in the other room preparing a warrant for a blood draw.

¶19    Due to the absence of the body camera video from our appellate record, we do not know exactly how long all of this took.

---

3. In our view, Officer's "reasonable time" statement—however well-intentioned—was ill-advised. As noted, it is inaccurate: motorists must provide an *immediate* response after receiving the refusal admonition. In that situation, our law does not provide motorists with a "reasonable time" to consider whether to submit to a test. We therefore discourage officers from complicating these situations by making statements inconsistent with the law.

But the district court had the opportunity to view the video, and therefore had better evidence than we do on this point. "It is an appellant's responsibility to include in the record a transcript of all evidence relevant to a finding or conclusion that is being challenged on appeal." *In re A. Dean Harding Marital & Family Trust*, 2023 UT App 81, ¶ 85 (quotation simplified). "When an appellant fails to provide an adequate record on appeal, we presume the regularity of the proceedings below, and when crucial matters are not included in the record, the missing portions are presumed to support the action of the [district] court." *Id.* (quotation simplified). Thus, we must presume that the video supports the district court's finding; under these circumstances, we are simply not in a position to second-guess the court's finding that Officer afforded Laker a reasonable time to make a decision about submitting to a chemical test.

¶20 Nevertheless, Laker resists these conclusions by asserting that his due process rights were violated.[4] In support of his argument, Laker relies on our supreme court's statement, given in *Holman v. Cox*, 598 P.2d 1331 (Utah 1979), that "[f]airness and due process require that a person threatened with the loss of his driver[] license should be afforded an opportunity to make a

---

4. The State contends that Laker failed to preserve a due process claim, and it therefore should not be considered on appeal. *See State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 ("When a party fails to raise and argue an issue in the [district] court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation."). A review of the trial transcript shows that Laker's argument relied heavily on *Holman v. Cox*, 598 P.2d 1331 (Utah 1979), and he urged the court to rely on the principles outlined therein, particularly those concerning "fairness and due process." After considering Laker's argument from the trial in its entirety, we are satisfied that he raised his due process claim sufficiently for us to address it.

choice based on a fair explanation of his rights and duties."[5] *Id.* at 1334. According to Laker, due process principles required Officer to specifically explain to Laker that anything other than an immediate expression of consent would be considered a refusal. But here, Laker has not borne his burden of demonstrating a violation of a constitutional right.

¶21 "At its core," procedural due process guarantees two things: "reasonable notice and an opportunity to be heard." *In re adoption of B.Y.*, 2015 UT 67, ¶ 16, 356 P.3d 1215. As we understand it, Laker's contention is that he was not given fair "notice" that his failure to immediately consent to a chemical test would be considered a refusal under the law.[6] We reject this argument

---

5. Laker states that *Holman* "dealt specifically with the substantive Due Process rights of a driver" under the implied consent law. But, as the State points out, the issues raised by Laker implicate *procedural* due process, not substantive due process. This distinction is semantic here, however, because we reject Laker's claim no matter the label used to describe it.

Moreover, we note that the *Holman* court was addressing potential confusion between the requirements of the implied consent statute and the rights enumerated under *Miranda v. Arizona*, 384 U.S. 436 (1966). *See Holman*, 598 P.2d at 1332–33. Following the *Holman* decision, officers now have at the ready an additional admonition that is given whenever a motorist attempts to invoke a right to an attorney following the refusal admonition. But here, Laker did not attempt to invoke a right to an attorney, and therefore the concerns at issue in *Holman* are not implicated.

6. We do not perceive Laker as asserting that he was not afforded an adequate opportunity to be heard. After all, Laker participated in two evidentiary hearings in this matter, one at the administrative level and another in the district court. We therefore do not further address any such argument.

largely because citizens are generally presumed to know what the law is, and because procedural due process principles generally do not require law enforcement officers to notify citizens of what the law is before taking action against them for violation of it.

¶22 It is a "well-accepted maxim that ignorance of the law is no excuse." *State v. Stewart*, 2019 UT 39, ¶ 37, 449 P.3d 59 (quotation simplified). While "due process places some limits on [the] exercise" of this general rule, *see Lambert v. California*, 355 U.S. 225, 228 (1957), our supreme court has noted that only in very limited situations are government officials required to explain the law to citizens, *see Stewart*, 2019 UT 39, ¶ 38 (identifying examples of such situations, including *Miranda v. Arizona*, 384 U.S. 436 (1966)). And these rare situations "are exceptions that prove the rule," which is that "[u]nless and until the law expressly requires open announcement and express waiver, we presume an understanding of the existence of rights guaranteed by the constitution—and charge parties with the duty of asserting their rights, while imposing the consequence of forfeiture if they fail to do so at the time and in the manner required" under the law. *Id.*; *see also, e.g., United States v. Reddick*, 203 F.3d 767, 771 (10th Cir. 2000) (stating that "due process does not require" that a person have had "actual knowledge of" the requirements of a particular statute before being convicted of violating it); *United States v. Coccia*, 249 F. Supp. 2d 79, 81 (D. Mass. 2003) ("[D]ue process does not require a defendant to have knowledge of the prohibitions embodied in [a] federal statute because ignorance of the law does not excuse criminal liability.").

¶23 Laker makes no effort, in his appellate briefs, to grapple with this general rule or to explain why, in this particular situation, he was entitled to a specific explanation of the meaning of the term "refusal." After all, our law—in both statutes and case law—has for decades defined "refusal" as including anything other than an "immediate request" for a chemical test. *See* Utah Code § 41-6a-520(2)(b)(i); *see also Lee*, 722 P.2d at 767. Laker cites

no authority supporting his argument that he was constitutionally entitled to specific notice of what "refusal" means under the law, over and above the notices he already received regarding the law's provisions that, if he refused Officer's request to submit to a chemical test, there could be consequences.[7]

¶24 Finally, in connection with his due process argument, Laker again points to Officer's "reasonable time" comment, and asserts that Officer's incorrect statement of the law had a negative effect on his due process rights. But as already noted, even if we were to assume, for purposes of any discussion, that Laker should have been given a reasonable time within which to make his decision, the district court found—supported by substantial evidence—that he was given a reasonable time. Under these circumstances, we cannot see how Officer's comment had any appreciable impact on Laker's due process rights.

CONCLUSION

¶25 The district court did not err in determining that Laker had refused Officer's request for a chemical test. And the court's

---

7. The implied consent statute itself requires law enforcement officers to "warn" motorists that "refusal to submit" to a request for a chemical test may have negative consequences, including revocation of motorists' driver licenses. *See* Utah Code § 41-6a-520(2)(a). But neither that statute, nor any other of which we are aware, requires officers to further explain what "refusal" means. In our view, it may be a good idea to add language to the typical refusal admonition designed to make clear that anything other than an "immediate request" for a chemical test constitutes a "refusal." We encourage law enforcement entities to consider such an addition. But for the reasons discussed herein, Laker has not demonstrated that any such addition is constitutionally or statutorily required.

finding, in the wake of Officer's incorrect "reasonable time" statement, that Laker had been afforded a reasonable time to make his decision was supported by substantial evidence. Finally, Laker has not borne his appellate burden of demonstrating a violation of his constitutional due process rights.

¶26    Affirmed.

————